Argued October 3, 1957, reargued November 19, 1958,
affirmed March 11, 1959

# WARNER VALLEY STOCK COMPANY v.
## LYNCH ET AL
### 336 P. 2d 884

*Forrest E. Cooper* of Lakeview, and *George H. Brewster* of Redmond, argued the cause for appellants. With them on the brief was George T. Cochran of La Grande.

*Theodore R. Conn* of Lakeview, argued the cause for respondent. With him on the brief was Ganong, and Ganong, of Klamath Falls.

O'CONNELL, J.

This is an appeal from a decree of the Circuit Court for Lake County ordering the State Engineer to issue to the applicant-respondent, Warner Valley Stock Company, permits for the construction of two storage reservoirs for the impoundment of certain waters in Warner Valley and to issue permits for the appropriation of the waters so impounded.

The objectors-appellants are landowners in Warner Valley who attack the decree principally upon the ground that the issuance of such permits would be in violation of their vested rights in the flow of the waters proposed to be stored and appropriated by the applicant.

The matter was presented to the circuit court upon an "appeal" from an order of the State Engineer rejecting the applications for permits upon grounds which will be explained later. In order to understand the points of conflict presented on this appeal it is necessary to visualize the topography of Warner Valley, the character of the water flow and the location of the lands owned by the various water appropriators in the valley. The State Engineer's order in this case describes these features as follows:

"Warner Valley is situated in Lake County, Oregon, about thirty miles east of Lakeview. The valley proper begins a short distance north of the state line between Oregon, California and Nevada and extends to a short distance south of the south line of Harney County, Oregon, having an approximate length of sixty miles and an average width, with the exception of one place, of from four to eight miles.

"Warner Valley is wholly surrounded by mountains. Those on the west and east sides rise somewhat abruptly to a height of approximately 1000 feet above the valley floor. Those on the north and northwest have a more gentle slope but reach to approximately the same general elevation.

"The elevation of the valley floor is approximately 4,500 feet above mean sea level and has indications of having at one time been one large lake, however, conditions have changed so that there now exists a chain of small lakes, swamps and lands which naturally are flooded.

"Just south of Hart Lake a low ridge extends from mountains on the west almost across the valley, thus forming two valleys. The area to the south is known as South Warner Valley and the area to the north

in which Hart Lake is located is known as North Warner Valley.

"In South Warner Valley on the west side are Pelican Lake and Crump Lake and along the east side are three small lakes known as Fisher Lake, Greaser Lake and Dodson Lake. North of Hart Lake there is a chain of eight lakes extending to Bluejoint Lake. These lakes are known as Anderson Lake, Swamp Lake, Mugwump Lake, Flagstaff Lake, South Campbell Lake, North Campbell Lake, Turpin Lake and Stone Corral Lake.

"The water supply of Warner Lakes is furnished almost entirely from three streams—Twentymile Creek, Deep Creek and Honey Creek. Twentymile Creek flows into South Warner Valley at the south end and Deep Creek flows into South Warner Valley from the west side about seven miles north of Twentymile Creek. Honey Creek flows into North Warner Valley from the west near the town of Plush and is tributary to Hart Lake. All three of the above named streams flow for some distance through narrow canyons before reaching the valley. Waters from all three of these streams and tributaries are diverted above Warner Valley for the irrigation of lands lying adjacent to the streams.

"Prior to the construction of the works, hereinafter described, by the Warner Valley Stock Company there existed no well defined channels in South Warner Valley. The waters of Twentymile Creek and Deep Creek which flow into South Warner Valley spread over the valley flooding during high water periods some 36,090 acres, the surplus draining into Hart Lake and co-mingling with the water flowing from Honey Creek.

"A part of the works which have been constructed

by the Warner Valley Stock Company to control the waters of Twentymile Creek so as to prevent lands from flooding consists of a dike along the south and east sides of South Warner Valley to convey the flood waters of Twentymile Creek. This dike, some 15 miles in length, is constructed with earth excavated from the outside and extends from the place where Twentymile Creek enters South Warner Valley within the SE ¼ SE ¼, Section 24, Township 40 South, Range 39 [sic, 24] East, W. M., to about one mile north of the dam located in the SW ¼, Section 17, Township 39 South, Range 25 East, W. M., and acts as a main channel carrying the flood waters of Twentymile Creek.

"Water for irrigation is secured from the bypass channel by means of pipes with gates, extending through the dike at various places. In addition to the dike and bypass channel through which the waters of Twentymile Creek are controlled, the Warner Valley Stock Company has constructed deep, interior drainage ditches, canals for distributing irrigation water and pumping plants to remove the drainage and seepage water. The drainage water is pumped over the dike along the north end of the lands which have been reclaimed and is conveyed in two drainage canals which have been constructed to convey the water together with waters of Deep Creek north toward the Crump Lake area.

\* \* \* \* \*

"As above stated, North Warner Valley and South Warner Valley are connected by a comparatively narrow strip about one-fourth mile wide and about 3.2 miles long. In this section is located the Stone Bridge referred to in the Court Decree as the point of division in the distribution of water.

\* \* \* \* \*

"The principal source of water for Hart Lake which is located at the south end of North Warner Valley is the surplus water of Twentymile Creek and Deep Creek which flows into South Warner Valley and Honey Creek which enters the valley floor of North Warner Valley near Plush.

\* \* \* \* \*

"Water overflowing Hart Lake is used in the irrigation of several thousand acres of land north and adjacent to the lake which are growing natural meadow grasses and the surplus, in years of large runoff, drains into Bluejoint Lake which is the most northerly lake in the chain of Lakes in Warner Valley.

\* \* \* \* \*

"Some of the water conveyed through the bypass channel which was constructed by the Warner Valley Stock Company to convey the water of Twentymile Creek around the south and east side of South Warner as a part of the works to drain and improve lands in South Warner, as above described, flows into Greaser Lake and Spanish Lake, the beds of which are lower in elevation. In 1949, prior to the filing of the applications by the Warner Valley Stock Company for a permit to store water in Greaser Lake, a dam had been constructed across the bypass channel at a point within the SW ¼ of Section 17, Township 39 South, Range 25 East, W. M., and at the east end of this dam a spillway channel has been constructed through which surplus water flows. This dam retains some water in Greaser Lake and Spanish Lake which, prior to its construction, flowed north through the bypass channel.

"Plans submitted by the Warner Valley Stock Company show that in addition to the dam across the bypass channel, it is proposed to raise the height of the

dike along the west side of the bypass channel for a distance of about 9½ miles above the dam.

"It appeared from the inspection made on June 4, 1953 that the only work in developing storage in Greaser Lake was the construction of the dam across the bypass channel and the spillway.

"It also appears that the quantity of water collected in Greaser Lake and Spanish Lake is approximately the same as before the construction of the dam across the bypass channel as the dike along the west side is low and at the time of inspection on June 4th there existed no indication that the dike had been raised. The water which is held in Greaser Lake and Spanish Lake by the dam in the bypass channel is released through conduits extending through the dike for irrigating the lands with a water right after the supply from other sources is not adequate. The lands upon which this stored water is used are in their natural condition producing grasses which are cut for hay early in July of a normal year or used for pasture. The surplus water from these lands flows north just as before the construction of any reclamation work."

As stated above, the applicant sought permits for the construction of two storage reservoirs. One of these, to be known as Greaser Lake Reservoir, was to be located to the south and east of Pelican Lake, the most southerly of the string of lakes in Warner Valley. This application filed in October, 1950 was accompanied by an application to appropriate the water proposed to be stored as a supplemental supply for the irrigation of 4,465 acres of land.

The other proposed reservoir, described as Big Valley Reservoir, was to be located approximately two townships west of the Greaser Lake Reservoir. The

applicant filed an application for a permit to appropriate the water proposed to be stored in Big Valley Reservoir as a supplemental supply for the irrigation of 19,500.9 acres of land. These applications were filed in March, 1951. All of the lands proposed to be irrigated by the applicant are located in the South Warner Valley.

Protests were filed by the objectors, and on June 2, 1953 a hearing was held before the State Engineer at which hearing evidence was presented by both applicant and objectors.

The principal objections presented at the hearing and urged on this appeal are predicated upon claimed rights to the water as determined in a decree of the Circuit Court for Lake County, dated September 30, 1929 which, with minor modifications, affirmed the findings and order of determination of the State Engineer in the proceedings for adjudication of the relative rights to the use of the waters of Warner Lakes and their tributaries.

More specifically, the objections are as follows. It is claimed that the impoundment of the waters in the proposed reservoirs will reduce the flow of waters to Hart Lake from Twentymile Creek and Deep Creek. Those objectors who rely upon the overflow of Hart Lake to irrigate their lands contend that the retention of the water by the applicant would interfere with this overflow and would constitute an impairment of their vested right to such waters. It is claimed that the right to this method of irrigation by natural overflow and drainage was acquired by use, and affirmed by the 1929 adjudication of the water rights in Warner Valley. One of the questions before us is whether such a right exists. Stated differently, the question raised by this protest is: Do these objectors have the right to

insist that Hart Lake be fed with waters none of which, below the point of overflow, will be used for application upon the land in Warner Valley, but will serve only to raise the surface of the lake to the point of overflow?

Two of the objectors, whose land lies north of Bluejoint Lake, contend that their right to the waters in that lake will be interfered with because the retention of the waters in the proposed reservoirs would prevent any water from reaching the lake. This contention carries with it the assertion of a right to have all seven of the lakes between Hart Lake and Bluejoint Lake filled with water in order to carry the water by natural flow to the objectors' source of supply. We are called upon to determine whether they acquired such a right under the 1929 decree.

In the case at bar the State Engineer decided that in order to determine whether the proposed impoundment of the water as requested in the applications for permits would result in a violation of the objectors' rights, it would be necessary to interpret the court decree of 1929 referred to above, and being of the opinion that this question of interpretation was not within his province but rather for the court, he rejected the applications.

■ We must, therefore, construe the findings and order of determination upon which the decree of 1929 was based. In those proceedings, the predecessors in interest of those objectors who rely upon the overflow waters from Hart Lake also asserted a right to pump water from the lake, contending that their right to the overflow entitled them to use artificial means in obtaining such waters if they chose to do so. In passing upon this claim in the proceedings which culmi-

nated in the 1929 decree, the State Engineer stated in his findings and order:

"It is generally conceded that the present method of irrigation by natural overflow is an extremely wasteful one. The proposed diversion by pumps and through artificial ditches would no doubt tend to conserve the water rather than require the use of a greater quantity. Furthermore, it would seem that the best interests of the public at large would be served if the water which is now permitted to lie idle in the lake merely for the purpose of providing a means of diversion for the relatively small quantity actually used, could be drawn from the lake and applied to a beneficial use in assisting and improving the present crude methods of irrigation.

"Hart Lake is a shallow body of water, and in its former natural state overflowed through three or more main channels or sloughs. These channels extended down the valley, but were well defined only for short distances, soon widening out into mere depressions. In the high water seasons the water overflowed from the sloughs and spread over a wide area of the valley, continuing northward through a series of lakes for a distance of twenty miles or more. It appears that after the valley became somewhat settled, in order to cause the water to reach higher areas, the flow of the water from the lake was retarded by placing dams in its outlets, thereby raising the lake surface until it overflowed the lands more uniformly. This control of the lake overflow has apparently been exercised by the more or less common consent of all the land owners affected. But due to the extreme shortage of water during the last few years the overflow from the lake has been insufficient to produce crops. Hence the pumping plan proposed by Contestee.

"Under the usual conditions, it would appear that in case one appropriator were permitted to pump water from the lake, in some seasons no

water at all would overflow from the lake and therefore all other parties would have to resort to pumping to obtain water for the irrigation of their lands. As a matter of fact, this would doubtless tend towards conservation of water and would in time become a much more economical system of irrigation, as above noted. But would it constitute a violation of a legal right of Contestants to their present means of diversion, or merely be "damnum absque injuria?" We are inclined to the latter view. As stated by Mr. Justice Bean in the SilviesRiver [sic] case (1925) 115 Or. 27, at page 66: 'Nature has been very generous' to Contestants in this case. Thousands of acres have been irrigated for them, practically without expense or effort on their part. But the system is wasteful, and more economical methods must be employed to keep pace with modern developments. It would be a step backwards to permit them to maintain a large body of water in Hart Lake at a certain level merely for the purpose of continuing the 'natural flooding' system of irrigation. Moreover, the system fails them in the critically dry periods and in low water seasons, when the lake is too low to overflow at all. There may be a large amount of water remaining in the lake at such times, which if utilized by pumping, might mean the difference between crop success or failure to the appropriators thereof. The ease with which Contestants have been able to divert their water has been merely their own good fortune. It was not a right, but merely a privilege, to be enjoyed only until rendered impracticable by a fuller development and use of the unappropriated waters."

This finding was adopted by the circuit court in the decree rendered in 1929. In the decree of October 15, 1954, from which the present appeal was taken, the circuit court held "That the methods of use and diversion by Objectors of the waters of Hart Lake by permitting the same to overflow the banks of said Lake

are hereby declared to be wasteful and have been only a privilege and not a right * * *."

The conclusion that the objectors had acquired a privilege only to divert the waters by means of overflow and not a right to do so was based upon the lower court's interpretation of the 1929 decree. The overflow method of diversion described as a privilege both in the decree of 1929 and 1954 is wasteful in two respects, (1) because after the water leaves the lake it is permitted to spread out as a consequence of which there is considerable loss of water through evaporation and seepage, and (2) because such a method, if recognized as a vested right, would render the water in the lake unappropriable until the objectors had received three acre feet per acre for 6,532.15 acres. The finding and order upon which the 1929 decree was based described as wasteful both of these consequences of recognizing the overflow method of diversion and considered each of the reasons stated above as sufficient to render the interest of the overflow claimants a mere privilege. We think that this analysis of the objectors' interest is correct. But whether or not we agree with the soundness of the view expressed in the 1929 findings and order, the decree established the character of the interest of the objectors' predecessor and they are now bound by it.

The objectors, however, contend that the 1929 adjudication created in them a vested right to the overflow waters and that this right was not inchoate or made contingent upon the elimination of wasteful methods. It is argued that *Hough v. Porter,* 51 Or 318, 95 P 732, 98 P 1083, 102 P 729 (1908-09) can be distinguished on the ground that in that case the decree imposed a high duty of water which would result in preventing waste and that the claimants' water right

was thus impliedly made subject to the elimination of waste. *In re Silvies River,* 115 Or 27, 237 P 322 (1925) is distinguishable, it is claimed, in that the decree ordered the elimination of waste within a definite period of time, expressly making the right dependent upon the elimination of waste. We do not think that these distinctions are significant. In the cases relied upon the court was presented with a situation in which the wasteful methods of diversion diminished the supply of water then needed by others. In the 1929 adjudication that problem did not face the court because the demand for water in Warner Valley had not at that time reached the critical stage.

The 1929 decree (by adopting the language of the State Engineer) made it quite clear that the method of diversion described was "not a right, but merely a privilege to be enjoyed only until rendered impracticable by a fuller development and use of the unappropriated waters." That time has come. We hold that the method of diversion by way of natural overflow is a privilege only and cannot be insisted upon by the objectors if it interferes with the appropriation by others of the waters for a beneficial use. This is consistent with the principle announced in *Hough v. Porter,* supra, and *In re Silvies River,* supra. See also, *In re Willow Creek,* 74 Or 592, 144 P 505, 146 P 475 (1915).

The objectors rely upon several cases in support of their contention that their method of diversion of water by natural overflow could not be impaired by a subsequent appropriation. *Oliver v. Jordan Valley Land & Cattle Co.,* 143 Or 249, 16 P2d 17, 22 P2d 206 (1933); *Oliver v. Skinner and Lodge,* 190 Or 423, 226 P2d 507 (1951); *Salt Lake City v. Gardner,* 39 Utah 30, 114 P 147 (1911); *State ex rel Crowley v. District*

*Court,* 108 Mont 89, 88 P2d 23 (1939); *United States v. Gerlach Live Stock Co.,* 339 US 725, 20 ALR2d 633. In each of these cases, the interest in the waters which the court protected was a vested right. In the Oliver cases, the appropriator established that he had an adjudicated right to a certain quantity of water stored in a lake and, in addition, an adjudicated right as well as the State Engineer's permit to divert the water by pumping and by gravity flow through a ditch. In the instant case, the right acquired by the objectors to the waters overflowing the lake did not include the *right* to divert those waters by natural overflow; the *privilege* to so divert the water recognized in the 1929 decree was subject to subsequent rights to use the water more economically. The evidence conclusively shows that the water which would otherwise have to lie idle in Hart Lake in order to cause it to overflow is now needed for a beneficial use.

■ It should be emphasized that the objectors whose lands are irrigated by the waters from Hart Lake have acquired a vested right in waters of Warner Valley. By their original application of water to a beneficial use, subsequently recognized by the adjudication of 1929, the objectors acquired a right to irrigate 6,532.15 acres. These rights they still have. The fact that they no longer have the privilege of a natural overflow *method* of diversion does not mean that their right to the waters in Warner Valley exists only if the water in fact overflows Hart Lake. We interpret the 1929 decree as vesting in them a right to a certain quantity of water, viz., three acre feet per acre for 6,532.15 acres, but only under the circumstances and to the extent that the quantity of water flowing into Hart Lake is such that it would overflow if no water (other than water appropriated under a prior right) were

withdrawn from the lake or prevented from reaching it. The corollary is that if in a particular year the flow of water to Hart Lake is so small that the lake would not overflow, the objectors would have no right to the water in the lake or its tributaries. This limitation on the objectors' water right is stated in the State Engineer's findings and order upon which the 1929 decree was based. There it was said:

"There is still another question presented * * * as to whether Contestee [predecessor of objectors] has ever acquired any right to the waters in Hart Lake below the point where the lake overflows. If not, it would seem that the pumping of the water under these conditions would constitute a new appropriation. There is no doubt but that Contestee could under its present vested rights pump water from the lake when at the same instant there was water overflowing from the lake and upon its lands, to which it was entitled under its prior vested rights. It is well settled, however, that the holder of a perfected water right is limited in his appropriation to the quantity of water during the period of the year and under the conditions that he has actually been accustomed to use it. As indicated by the claim filed by Contestee, the only time at which it proposed to pump water from the lake is during the periods of subnormal water supply when there is no overflow from the lake, or at least not sufficient to reach Contestee's lands and properly irrigate the same. The use of the waters of Hart Lake under these conditions has never been enjoyed by Contestee in the past. It necessarily follows that the diversion of the additional water from the lake by pumping at such periods, would constitute a new appropriation to which it has no present right by virtue of natural overflow upon its lands. This applies not only to Contestee Lake County Land & Livestock Company, but to all others claiming present rights to Hart Lake water, based upon appropriation of its overflow. Below

the point of overflow, *no one* has appropriated the waters stored in the lake. The proper procedure for anyone who wishes to do so is to file an application with the State Engineer in the usual manner, for the use of this unappropriated water." Emphasis supplied.

Subsequent to the entry of the 1929 decree the predecessor of the objectors claiming the overflow from Hart Lake obtained a permit to pump waters from Hart Lake for application upon 6,006.85 acres of land.

Accepting this theory of the objectors' water rights, it would follow that the objectors would have no right to complain of the withdrawal of waters from Hart Lake or from the streams feeding it unless such waters would have overflowed Hart Lake if they had not been withdrawn.

The decree of the lower court in the case at bar indicates that the trial judge may have taken a different view. The decree states in part, "That the rights adjudicated to Objectors by Decree of the Circuit Court of the State of Oregon for Lake County in its Decree of September 30, 1929 and all rights subsequently initiated to the waters of Hart Lake constituted an appropriation from the streams tributary to Warner Valley."

If the objectors' rights are to overflow waters only then the decree should have stated that the adjudicated rights under the 1929 decree constituted an appropriation from the streams tributary to Warner Valley and from Hart Lake *to the extent that such waters would overflow Hart Lake if they had not been withdrawn or prevented from reaching the lake.*

However, it is not necessary to choose between these two conflicting theories because the decree in

the present case requires that from the seasonal flow the applicant deliver into Hart Lake an amount of water necessary to satisfy

"(a) The lands located in North Warner Valley with adjudicated rights to the use of water overflowing from Hart Lake, which lands have initiated rights to the use of water naturally stored in Hart Lake as a supplemental supply.

"(b) Lands located in North Warner Valley south of Flagstaff Lake which have adjudicated rights to the use of water overflowing from Hart Lake but have not on the date of Decree herein, initiated rights to the use of natural storage in Hart Lake as supplemental supply, provided application for permit shall be filed for said lands within one year from date of Decree herein, and"

This decree requires the applicant to bypass sufficient water to irrigate 6,532.15 acres owned by the objectors irrespective of whether any of such waters would overflow Hart Lake. The objectors were entitled to pumping rights for 6,006.85 acres. But under the theory of the 1929 decree, they would not be entitled to the remaining 525.30 unless such waters would have overflowed Hart Lake if not withdrawn.

◼ The applicant has not appealed from the decree. Therefore, we need not decide whether the decree improperly limited the applicant's right to appropriate water which would not have constituted overflow waters and to which the objectors would not be entitled.

Since we hold that the objectors have no right to continue the natural overflow method of diversion, we see no basis upon which they can attack the decree.

The objectors contend that they will be put to great expense in the construction of a pumping distribution system if they are deprived of the natural

overflow method of diversion. However, the decree protects the objectors by the following provision:

> "(d) That in addition to the quantity of water necessary to satisfy the above rights, additional water from the seasonal flow of Warner Lakes and their tributaries shall be delivered into Hart Lake at said Stone Bridge to compensate for seepage and evaporation in Hart Lake and to maintain a water level in Hart Lake so that water can be delivered to the pumps without construction of ditches of excessive lengths and for efficient operation of the pumps."

The objectors rely upon cases holding that if a subsequent appropriator desires to change stream conditions for his own benefit he must bear the cost which the change imposes upon a prior appropriator. *Oliver v. Jordan Valley Land & Cattle Co.*, supra; *Oliver v. Skinner et al.*, supra; *Dry Gulch Ditch Co. v. Hutton*, 170 Or 656, 133 P2d 601 (1943); *Salt Lake City v. Gardner*, 39 Utah 30, 114 P 147 (1911); *Big Cottonwood Tanner Ditch Co. v. Shurtliff*, 556 Utah 196, 189 P 587 (1919). In these cases the prior appropriator had a right to continue the method of diversion which was affected. The objectors have no adjudicated right to diversion by overflow and in this respect the cited cases are not applicable. But the objectors' pumping rights for 6,006.85 acres are vested rights and if the withdrawal of water by the applicant unreasonably interferes with those rights the objectors are entitled to relief.

■■ Further, the lower court's decree in the present case allows the objectors one year in which to file an application for pumping rights for the remaining 525.30 acres. The applicant's permit is made subject to these rights if acquired. We construe paragraph (d) of the decree of the lower court as a recognition

of the objectors' right to be free from unreasonable interference with their pumping operation. In the event that applicant fails to abide by the decree the objectors will be entitled to relief.

We next consider the interest of the objector Alice Laird. The manner in which the Laird lands were irrigated is described in the findings and order of the State Engineer in the present proceeding, as follows:

> "It appears that the Laird lands in 1910 were irrigated by water overflowing from Bluejoint Lake and as the water receded, the lands were irrigated by pumping. On June 4, 1953 a canal had been constructed to convey water from Bluejoint Lake to a pumping plant, consisting of two pumps driven by a tractor and water was being pumped under a head of approximately 8 to 10 feet for irrigation. The area of water surface at Bluejoint Lake or the storage therein during the time the Laird lands were irrigated by pumping is not known."

Her interest was described and defined in the 1929 decree as follows:

> "* * * The evidence introduced establishes the fact that at various times this land has been adequately irrigated by backwater from Bluejoint Lake, but it appears that only a part of the area has been irrigated during the past several years, due to deficiency of water supply, and that this irrigation was accomplished by pumping the water from the Lake. This tract of land is situated something like 30 miles north of Hart Lake, and during recent years practically no water from Hart Lake has flowed that far down the valley. Although it may be said that there is one continuous water course from Hart Lake to Bluejoint Lake, there are several large depressions in the area between, forming lakes of considerable size when there is water enough to fill them, such as Anderson,

Swamp, Mugwump, Upper Campbell, Lower Campbell, Stone Corral and Bluejoint Lakes. This happens only in times of high water. It would be an impracticable and wasteful use of water to enforce the priority of the Laird appropriation as against upper users near Hart Lake having subsequent priorities. In order to deliver from the Hart Lake area sufficient water for the Laird lands, in dry periods, many times the amount actually needed would have to be allowed to flow toward Bluejoint Lake. Therefore, although there has clearly been no abandonment of the water right, and a right to water from Bluejoint Lake will be recognized when the water reaches the land from natural causes or under the conditions as they have existed in the past, no right shall attach which will entitle the claimant to insist on the delivery of the water as against upper users."

The objectors contend that the decree did not subordinate the Laird right to all "upper users" but only to those in North Warner Valley because the water users in South Warner Valley were not parties to the 1929 adjudication. This is not an accurate statement of the character of the 1929 proceedings. All of the Warner lakes and their tributaries were the subject of the adjudication. The decree is, therefore, binding upon the objector Laird in relation to all "upper users" in Warner Valley including the applicant.

The finding and order recite that notice by publication and by registered mail was given. All persons claiming an interest in the waters of Warner Valley had the opportunity to present their claims. The purpose of the adjudication was to determine the relative rights of all such persons whether their land was located in North or South Warner Valley, and the statutes governing the adjudication procedure gave the determination conclusive effect upon "all prior rights,

and the rights of all existing claimants upon the stream or other body of water lawfully embraced in the determination." Oregon Laws, § 5750, now found in ORS 539.200.

In the decree entered in the present case the court interpreted the decree of 1929 as recognizing a right to irrigate the Laird lands "only when waters are in Bluejoint Lake in sufficient quantities to permit such irrigation." We agree with this interpretation. If we were to assume that the nature of the Laird water right had not been determined in the 1929 adjudication, we would now decide that the right would not entitle her to insist upon the flow of waters into the Warner Valley lakes south of Bluejoint Lake. To so define her right would result in rendering useless a large quantity of water necessary to fill these lakes, and, as the evidence establishes, leave open to evaporation a large water surface area. The irrigation of the Laird lands under such circumstances would not constitute a beneficial use of water within the meaning of ORS 537.120.

■ The objectors also assert that the trial court should have dismissed the appeal on the ground that the applicant did not come into court with clean hands. It is contended that the applicant constructed and placed in operation the Greaser Lake Reservoir in violation of ORS 537.130 which prohibits the storage of water without a permit and contrary to the 1929 water adjudication decree which enjoined any use of the waters of Warner Valley except as authorized by the decree.

It appears from the evidence submitted at the hearing before the State Engineer that some water was retained in Greaser Lake as a result of the construction of a dam by the applicant. However, the dam was not constructed for the purpose of impound-

ing the water in Greaser Lake but to reclaim land in south Warner Valley by confining the waters and directing the flow in a more concentrated form. The nature of the works constructed by the applicant is described earlier in this opinion. The effect of these works on the flow of water and the relation between these works and the projected reservoir are described in the order of the State Engineer as follows:

> "Some of the water conveyed through the bypass channel which was constructed by the Warner Valley Stock Company to convey the water of Twentymile Creek around the south and east side of South Warner as a part of the works to drain and improve lands in South Warner, as above described, flows into Greaser Lake and Spanish Lake, the beds of which are lower in elevation. In 1949, prior to the filing of the applications by the Warner Valley Stock Company for a permit to store water in Greaser Lake, a dam had been constructed across the bypass channel at a point within the SW $\frac{1}{4}$ of Section 17, Township 39 South, Range 25 East, W. M., and at the east end of this dam a spillway channel has been constructed through which surplus water flows. This dam retains some water in Greaser Lake and Spanish Lake which, prior to its construction, flowed north through the bypass channel."

The State Engineer concluded that the quantity of water impounded by the applicant's dam was "approximately the same as before the construction of the dam," and again he stated that, "The surplus water from these lands flows north just as before the construction of any reclamation work." There is no evidence of substance contradicting the foregoing observations of the State Engineer. Therefore, we conclude that the objectors have not shown conduct on the

part of the applicant which would call for the application of the clean hands doctrine.

Finally, the objectors contend that the circuit court for Lake County had no jurisdiction in this case. The cornerstone of this contention is the separation of powers doctrine. Oregon Constitution, Article III. It is argued that the determination of the State Engineer in denying the applicant a permit is an administrative function and that it is conclusive unless it is attacked by the institution of a separate suit in the circuit court; that the circuit court cannot obtain jurisdiction unless the State Engineer is made a party to the proceedings by the service of a "summons or process;" and that since the State Engineer is not a party to the appeal his findings are not subject to attack or review. In other words, the appeal to the circuit court in this case is viewed by the objectors as a collateral attack upon the findings of the State Engineer, and since no issue was formed in the suit brought in the circuit court as to the correctness of these findings, the circuit court had no jurisdiction.

It is urged that the issue formed in the administrative proceedings was tried by the State Engineer and he decided that the application for the permit should be denied; that the findings of the State Engineer are presumed to be correct, and that these findings can be reviewed by the circuit court only for the purpose of determining whether the State Engineer's acts were outside of his authority, were arbitrary, or were not justified by the facts. For this last proposition the objectors rely upon *Broughton's Estate v. Central Oregon Irrigation District,* 165 Or 435, 101 P2d 425, 108 P2d 276 (1940).

In order to appraise properly the objector's con-

tention, it is necessary to examine the statutory scheme for judicial review of administrative determinations made under our water code. We note first a division in the Oregon Revised Statutes between the procedure set out in Ch 539 for the determination of water rights initiated before the adoption of the water code on February 24, 1909, and the procedure incident to the granting, denying and cancellation of permits after that date.

Under ORS Ch 539 one or more water users on a stream may petition the State Engineer to determine the relative rights of the various claimants to the waters of that stream. If, upon investigation, the State Engineer finds that the facts and conditions justify it, he is required to make a determination of these rights. The chapter contains elaborate provisions for notice and hearing for all parties whose rights might be affected by the determination. (ORS 539.030 et seq.) At any time prior to the hearing, any party may file exceptions to the findings and order of determination of the State Engineer, specifying the particular paragraphs of findings which are attacked. The State Engineer's findings of fact, order of determination of rights to the stream, the original evidence gathered by the engineer and certified copies of the observations and measurements, and maps of record in his office in connection with the determination are filed with the clerk of the circuit court wherein the determination is to be heard. The circuit court then fixes a time for hearing and each owner who appeared in the proceeding is notified and given an opportunity to present his case. (ORS 539.130) It is provided that the proceedings in the circuit court "* * * shall be like those in a suit in equity * * *." (ORS 539.150)

After the final hearing, the circuit court enters a decree affirming or modifying the order of the State Engineer (ORS 539.150).

The procedure under ORS Ch 539 is to be contrasted with the procedure provided for in passing upon an application for a permit to use stream water under the 1909 water code. This latter procedure, which is found in ORS Ch 537, is applicable to the case at bar. Under this chapter the filing of an application for a permit is a prerequisite to the acquisition of a right to the beneficial use of waters. (ORS 537.130). If, in the judgment of the State Engineer, a hearing is necessary to determine whether the proposed use will conflict with existing rights or be prejudicial to the public interest he may hold a hearing after notice to the applicant and protestants (ORS 537.180). Unlike the procedure under Ch 539, no provision is made for the publication or mailing of notices to those who might be affected by the granting of the application. Judicial review of the administrative action taken under this chapter is provided for in ORS 537.200, which reads as follows:

"An appeal may be taken from any order made by the State Engineer, pursuant to the provisions of ORS 537.150 to 537.190, rejecting or allowing any application in whole or in part, by any person appearing before the State Engineer or State Water Resources Board as applicant or objector in respect to the application. The appeal shall be taken to the circuit court of the county in which the waters involved or some part thereof are situated. It must be taken within 30 days from the date of mailing a copy of the order of the engineer or water resources board to the applicant or objector. The appeal shall otherwise be governed by the practice in suits in equity. An appeal may be taken from

the final order or decree of the circuit court to the Supreme Court." ORS 537.200.[1]

[1] An appeal provision of general applicability is found in ORS 536.560, which reads as follows:

"Any person, public corporation or state agency who deems himself aggrieved by any order, rule or regulation of the State Water Resources Board under this Act may appeal from the same to the circuit court of the county in which the property affected by such order, rule or regulation or any part of such property is situated. The appeal may be carried from the circuit court to the Supreme Court, and shall be governed by the practice in suits in equity." ORS 536.560.

It will be observed that the procedure at the administrative stage provided for in ORS Ch 539 very closely simulates traditional court procedure, providing the equivalent of the service of process, a method of joining issue, a hearing and a decree. In contrast, the provisions of ORS Ch 537 relating to the granting of permits appear to be framed upon the theory that such a proceeding before the State Engineer is in effect ex parte and only through intervention does the "objector" make known his claims. It may be noted that the published rules and regulations of the Office of State Engineer (1953) supplement the statutes, indicating the administrative procedure where the approval of an application for a permit is contested.[2]

[2] PROTESTS

Any person or persons desiring to contest the approval of an application for permit, the granting of an extension of the time limits for the completion of construction work or complete application of water under a permit, the issuance of a water right certificate, or

the approval of an application for a transfer of the point of diversion or place of use under a water right, shall file a written protest with the State Engineer setting forth the grounds for such protests.

\* \* \* \* \*

A copy of each protest must be served on each party whose right is protested, such service to be made by the party making the protest. Service shall be made by registered mail or by personal delivery.

Each protest shall contain a statement that a copy thereof has been served upon the protestee and shall state the manner of service, i.e., whether personally or by mail.

Each protest shall contain the name and address of the protestant, name and address of protestee and a description of the application or permit being contested.

If the protest is made on the grounds that the proposed appropriation, extension, issuance of certificate or transfer will cause an injury to the protestant, the protest shall contain such allegation and shall state the nature of such alleged injury.

The protest shall also state the basis of protestant's water right which it claimed will be injured.

If the protest to the approval of an application is on the grounds that it will prejudicially affect the public interest, the protest shall contain such allegation and shall state the nature of such alleged injury.

Each protest shall set forth fully the grounds upon which the protest is based and shall contain an affidavit that all allegations and statements contained therein are true and correct to the best of the protestant's knowledge.

No protest to the approval of an application submitted after application has been approved and permit issued can be considered.

No protest to the granting of an extension of time or issuance of a certificate can be accepted from any party holding a right prior to the one being protested.

Any person owning an application, permit, or certificate subsequent in priority may contest before the

State Engineer the issuance of a water right certificate at any time before the same has issued and after the time has expired for the completion of the appropriation under such permit, or within the period of three months after issuance of such certificate, and not otherwise.

Protests may be supported by affidavits of witness or other documentary evidence.

When a protest is filed the State Engineer will make an investigation and hold a hearing if it is deemed advisable.

## HEARINGS

Hearings are conducted by the State Engineer or his duly authorized assistant in the manner of a court of equity except that the hearing is less formal.

At such hearing whatever evidence, including the testimony of witnesses, as may be essential to the clear understanding of all matters involved may be taken.

After the conclusion of the hearing, the State Engineer enters an order disposing of the matter, copies of which are mailed to the parties involved.

Such order of the State Engineer is subject to appeal to the circuit court of the county in which the waters or any portion of such waters involved in the matter are located, within 30 days after the date of such order.

---

If the procedure established through administrative rules and regulations were regarded as providing the equivalent of a trial before a judicial tribunal then ORS 537.200 permitting an "appeal" from the order of the State Engineer would give the circuit court jurisdiction of the cause upon which issue had been formed at the administrative stage. But it was established in *Broughton's Estate v. Central Oregon Irrigation District,* supra, that the word "appeal" as used in ORS 536.060 (which is essentially the same as ORS

537.200 for the purposes here dealt with) does not denote an appeal from one judicial tribunal to another but merely describes a method of review, through the institution of an original judicial proceeding in the circuit court. (165 Or at 462.)

■ Although the appeal to the circuit court is regarded as the institution of an original suit in that court, this does not mean that the administrative proceedings before the State Engineer are wholly divorced from the proceedings in the circuit court. In *Pacific Live Stock Company v. Lewis,* 241 US 440, 60 L ed 1084 (1915), in commenting upon the character of the administrative proceedings before the State Water Board under what is now ORS Ch 539, the court said:

"* * * They are not independent or unrelated, but parts of a single statutory proceeding, the earlier stages of which are before the board and the later stages before the court. In notifying claimants, taking statements of claim, receiving evidence, and making an advisory report, the board merely paves the way for an adjudication by the court of all the rights involved. As the supreme court of the state has said, the board's duties are much like those of a referee. (And see Washington ex rel. Oregon R. & Nav. Co. v. Fairchild, 224 US 510, 526, 527, 56 L. ed. 863, 868, 869, 32 Sup. Ct. Rep. 535.) All the evidence laid before it goes before the court, where it is to be accorded its proper weight and value. That the state, consistently with due process of law, may thus commit the preliminary proceedings to the board and the final hearing and adjudication to the court, is not debatable. And so, the fact that the board acts administratively and that its report is not conclusive does not prevent a claimant from receiving the full benefit of submitting his claim and supporting proof to the board." *Pacific Live Stock Co. v. Lewis,* supra at p 1098.

Viewed as a continuous proceeding we can look back to the administrative stage in filling out the essential procedural requirements for jurisdiction in the circuit court. The fact that the suit was not initiated by the service of summons does not prevent the court from obtaining jurisdiction. This is the conclusion reached in *Bray v. Superior Court,* 92 Cal App 428, 268 P 374 (1928), where the California statutory equivalent of ORS Ch 539 was under consideration. The court said:

> "That the parties were brought into court other than by means of the issuance of a summons does not appear to us to affect the constitutionality of the act. The question really is, in every case, whether the court has jurisdiction of the parties and of the cause. * * * That, after having acquired jurisdiction of the parties, the subsequent proceedings may not be in all particulars identical with the trial of some other civil action, such as a damage suit, does not affect the constitutionality of the section in question." *Bray v. Superior Court,* supra at p 377.

■ In the case at bar, after the applicant filed its application for a permit the objectors filed protests with the State Engineer. A hearing was held before him. The objectors appeared at that hearing, presented evidence and cross-examined applicant's witnesses. When the order was made rejecting the application, the applicant served a "Notice of Appeal" and an "Undertaking on Appeal" upon the State Engineer and upon the objectors. The applicant filed with the clerk of the circuit court a transcript consisting of the application for permit, the objectors' protests, the order of the State Engineer, the "Notice of Appeal", and the "Undertaking on Appeal." The State Engineer certified to the circuit court all of the exhibits and a

transcript of the testimony presented at the hearing before him.

The foregoing procedure was sufficient to vest jurisdiction of the cause in the Circuit Court for Lake County. Contrary to the objectors' contention, we think that this jurisdiction is sufficient to give the circuit court the power to re-examine the issue presented to the State Engineer, subject to the limitations we shall presently describe.

As pointed out earlier, the objectors rely upon *Broughton's Estate v. Central Oregon Irrigation District,* supra, in support of their contention that the findings of the State Engineer are presumed to be correct and that judicial review is limited to a determination of whether the State Engineer acted within his authority, acted arbitrarily, or that his acts "were not justified by the facts." In the Broughton case, the circuit court was called upon to review the State Engineer's action in granting an application for an extension of time within which to complete the construction of works and to apply water to a beneficial use. This court, speaking through Mr. Justice BAILEY, said:

> "The function of the circuit court in reviewing an order of the state engineer is limited to determining whether the acts of that officer are within the authority conferred upon him and whether such acts are arbitrary or not justified by the facts. The court is not granted the power to substitute its judgment for that of the engineer. In other words, the statute does not confer upon the court administrative duties that are imposed by law upon the state engineer. It is doubtful that a contrary construction of the statute would be in consonance with Article III of the Oregon constitution, which provides that the powers of the government shall be divided into three separate departments. See Keller v. Potomac Electric Power Company, 261

U.S. 428, 67 L. E. 731, 43 S. Ct. 445." *Broughton's Estate v. Central Oregon Irrigation District,* 165 Or 435, 462, 463.

In the paragraph preceding the quoted portion of the opinion the court said that, "In providing that such appeal 'shall be governed by the practice in suits in equity', the legislature must have intended that the matter should be tried in the same manner as a suit in equity originally instituted in the circuit court." If the matter were so tried then, of course, the court would "substitute its judgment for that of the engineer." If the court has the power to determine whether the acts of the State Engineer are "not justified by the facts" then it may substitute its judgment for that of the engineer and the two parts of the opinion are apparently inconsistent. However, upon a careful reading of the quoted paragraph it seems clear that Justice BAILEY was merely describing the limitations imposed upon powers of a court in reviewing administrative action by the separation of powers doctrine. When so understood, the apparent inconsistency disappears.

■ Our statutes providing for review of the action of the State Engineer would be unconstitutional if they were construed to vest in the courts the power to substitute their judgment on questions of *legislative* policy. This is taught by the leading case of *Keller v. Potomac Electric Power Company,* 261 US 428, 67 L ed 731, 43 S Ct 445, cited by the court in support of the statement quoted above. In other states where de novo review of administrative action is provided for the cases are in conflict. Some courts have held that such statutes are unconstitutional. *Cromwell v. Jackson,* 188 Md 8, 52 A2d 79 (1947); *Daniel v. Tyrrell & Garth Investment Co.,* 127 Tex 213, 93 SW2d 372

(1936); *Household Finance Corporation v. State,* 40 Wash 2d 451, 244 P2d 260 (1952). Other courts treat such statutes as expressing the constitutional limit upon judicial review. The position taken by these latter courts is described in 4 Davis, Administrative Law Treatise, § 29.10 p 184, as follows:

"Although the law of state courts is generally in agreement with the fundamental of federal law that courts cannot constitutionally be required to review de novo any administrative action that is deemed nonjudicial, the law of many state courts is in one important respect superior to federal law, in that no matter how clear the provision for de novo review, many courts use the constitutional doctrine not to strike down the statutory provision for review but to interpret it to provide for the kind of limited review that will be constitutional." 4 Davis, Administrative Law Treatise, supra.

In some of the cases in this group the courts have interpreted their statutes as limiting judicial review to a determination of whether the administrative officer acted within his authority, acted arbitrarily or based its order upon substantial evidence. *State Board of Medical Registration and Examination v. Scherer,* 221 Ind 92, 46 NE2d 602 (1943); *Langen v. Badlands Cooperative State Grazing Dist.,* 125 Mont 302, 234 P2d 467 (1951); *Jones v. Marsh,* 148 Tex 362, 224 SW 2d 198 (1949), but cf. *Daniel v. Tyrrell & Garth Investment Co.,* supra.

■ A part of the language in the Broughton case appears to adopt this latter interpretation, but read as a whole we think that the opinion states only the constitutional proscription which prohibits the court from substituting its ideas of legislative policy for those of the administrative officer invested with the authority to carry it out. In addition to this constitu-

tional limitation upon its powers, the court may limit its review by a self-imposed restriction against disturbing administrative findings in those areas in which the administrative agency is expert. This is the meaning of *Smyth et al. v. Jenkins et al.*, 208 Or 92, 299 P2d 819 (1956), where the court said:

"* * * It is seldom, if ever, that a court will interfere with discretionary action of the state engineer upon matters involving the administration of the water laws of the state and substitute its judgment for his. Judges are not super engineers. Broughton's Estate v. Central Oregon Irr. Dist., 165 Or. 435, 462, 101 P.2d 425, 108 P.2d 276." *Smyth v. Jenkins,* supra at p 823.

This does not mean that all orders of the State Engineer must be affirmed if supported by substantial evidence. The court may have the power to re-assess all the evidence. *DeMond v. Liquor Control Commission,* 129 Conn 642, 30 A2d 547 (1943).

In the Smyth case the court made its own appraisal of the evidence relating to the application of the water to a beneficial use and it adopted the written opinion of the trial judge who also exercised his independent judgment with respect to the beneficial use of the water. The court merely recognized that matters peculiarly within the competence of the State Engineer should be left for his determination, a point of view which we now wish to reaffirm emphatically.

We need only add that in numerous cases this court, as well as the circuit courts of this state, have substituted their independent judgment on a variety of matters which had been passed upon by the State Engineer, in some of which cases it is possible that the court may have gone so far in its review of the

administrative findings that an encroachment upon the legislative prerogative may have resulted.

 It is our conclusion that the Circuit Court for Lake County was empowered to exercise the powers of a court of equity in reviewing the determination of the State Engineer, and could, therefore, re-examine de novo the findings of the State Engineer to the extent that such re-examination did not involve the usurpation of the legislative function. In exercising its equity powers the trial court was privileged to rely upon those findings of the State Engineer which were within his special competence. *Smyth et al. v. Jenkins et al.,* supra.

We do not intend to say that the suits contemplated under our water statutes can be likened in all respects to the usual suit in equity. As stated in *Hough v. Porter,* 51 Or 318, 439, 95 P 732, 98 P 1083 (1909), "Water suits are, in a sense, sui generis * * *." After discussing cases in which the rules applicable to ordinary suits were relaxed in water litigation, the court said, at page 440, "It thus appears that courts of equity are not necessarily bound in all cases by the rules of practice usually invoked." See also *In re Silvies River,* supra, at p 92 and *Oliver v. Jordan Valley Land & Cattle Co.,* 143 Or 249, 269, 22 P2d 206, 211 (1933).

In the case at bar the trial judge in a colloquy with counsel indicated that he understood the Broughton case to mean that he would be bound by the State Engineer's "factual findings." When counsel for the applicant offered further evidence, an objection was interposed by counsel for the objectors on the ground that it would permit the applicant to try his case piecemeal, first before the State Engineer and later before the court. The objection was sustained on the ground

that the Broughton case precluded the introduction of any evidence other than that certified to the court by the State Engineer. The evidence consisting of the expert testimony of a hydraulic engineer was then admitted under the rule. The objectors did not cross-examine the witness and did not offer any evidence. The evidence offered by the applicant was admissible and the trial court should have overruled the objection to its introduction. However, the error is of no import because the evidence is available to us under the rule.

The entire record of the case consisting of various exhibits including maps, engineering data, pictures of various parts of Warner Valley, transcript of testimony taken before the State Engineer and the transcript of testimony taken before the trial court, is before us on this appeal.

■ As a court of equity we have, within the constitutional bounds described above, reviewed de novo this record including the findings of the State Engineer which were incorporated into the 1929 decree and those preliminary to the decree rendered in the case at bar. In doing so, we have recognized the truth expressed in *Smyth v. Jenkins et al.,* that "Judges are not super engineers" and we have, therefore, treated with great respect the State Engineer's appraisal of the evidence of the proceedings which were before him. We do not regard this as a cession of our judicial power or inconsistent with our duty under the statute to review the case de novo. It is simply the recognition of a practical necessity to divide the functions of the court and those of the legislative agency upon the basis of their respective expertise. Indeed, there is a respectable point of view that the constitutional functions of court and legislature should be divided on the basis of this criterion, allocating to each branch of

government the powers and duties which it is best qualified to perform. 4 Davis Administrative Law Treatise, §§ 30.04, 30.09.

Our review of the proceedings discloses no substantial error in the decree of the lower court. As we have indicated earlier, the decree more than adequately protects the interests of the objectors. It is, therefore, affirmed.