44 F.3d 758
 25 Envtl. L. Rep. 20,531
 UNITED STATES of America, Plaintiff-Appellant,
and
Klamath Allottees Water Users Association; Klamath Tribe,
Plaintiffs-Intervenors,
v.
STATE OF OREGON, Water Resources Department, and William H.
Young, Director, Defendants-Appellees.
UNITED STATES of America, Plaintiff,
and
Klamath Allottees Water Users Association, Plaintiff-Intervenor,
and
Klamath Tribe, Plaintiff-Intervenor-Appellant,
v.
STATE OF OREGON, Water Resources Department, and William H.
Young, Director, Defendants-Appellees.
UNITED STATES of America, Plaintiff,
and
Klamath Allottees Water Users Association,
Plaintiff-Intervenor-Appellant,
v.
STATE OF OREGON, Water Resources Department, and William H.
Young, Director, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellee,
and
Klamath Allottees Water Users Association; Klamath Tribe,
Plaintiffs-Intervenors,
v.
STATE OF OREGON, Water Resources Department, and William H.
Young, Director, Defendants-Appellants.
 Nos. 92-36983, 92-36985, 92-36987 and 92-37001.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 2, 1994.
Decided Dec. 28, 1994.
 
 Gary B. Randall, Michael A. Gheleta, John P. Lange, Robert L. Klarquist, and William B. Lazarus, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for plaintiff-appellant-cross-appellee U.S.
 Carl Ullman, Water Adjudication Project, Chiloquin, OR and Melody McCoy, Walter Echo-Hawk, Native American Rights Fund, Boulder, CO, for intervenor-appellant-cross-appellee Klamath Tribe.
 Dale T. White, Fredericks, Pelcyger, Hester & White, Boulder, CO, for intervenor-appellant-cross-appellee Klamath Allottees Water Users Ass'n.
 Rives Kistler, Asst. Atty. Gen., Salem, OR, for defendants-appellees-cross-appellants State of Or. and William H. Young.
 Appeals from the United States District Court for the District of Oregon.
 Before: ALARCON, NORRIS, and LEAVY, Circuit Judges.
 WILLIAM A. NORRIS, Circuit Judge:
 
 
 1
 These consolidated appeals arise out of the State of Oregon's attempts to adjudicate the rights of various claimants to the waters of the Klamath River Basin through a complex procedure created by state statute. We are called upon to address whether the State may compel the United States, the Klamath Indian Tribe and other owners of former reservation land to comply with certain terms of the state statute governing the Klamath Basin adjudication.
 
 
 2
 * Facts and Procedural History
 
 
 3
 In 1975, the Oregon Water Resources Department (OWRD) invoked Oregon's statutory procedure for the mass adjudication of water rights in order to determine all claims to surface water in the Klamath River Basin. The United States claims water rights in this basin on behalf of several federal agencies and as trustee for the Klamath Tribe. The State notified over 25,000 potential claimants, including appellants United States, the Klamath Tribe and members of the Klamath Allottees Water Users Association (Association), a group of individuals who own former reservation land in fee. That same year, the United States filed a suit in federal district court seeking a declaration of the water rights of the United States and the Klamath Tribe in certain tributaries within the Klamath Basin. In 1983, this court heard an appeal from the district court's decision in that case. See United States v. Adair, 723 F.2d 1394 (9th Cir.1983), cert. denied, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). We held that the United States and Klamath Tribe possessed reserved water rights to the rivers at issue in the litigation, but left the quantification of those rights to a comprehensive state adjudication of water rights under the provisions of the McCarran Amendment, 43 U.S.C. Sec. 666. Id. at 1406. We further stated, "although the Oregon water rights adjudication system is initially administrative and need not be judicial in nature, we will assume, without deciding, for the purposes of this case that it is not too informal to qualify as a 'suit' within the meaning of McCarran Amendment or a 'comprehensive state adjudication' within the meaning of Colorado River and San Carlos Apache Tribe. " Id. at 1405 n. 9 (citations omitted).
 
 
 4
 In 1990, the State reissued notices of its intention to adjudicate water rights in the Klamath Basin. In response, the United States, as owner of federal land in the Klamath Basin and as trustee for the Klamath Tribe, filed the present action in federal district court seeking a declaratory judgment that the United States has not waived its sovereign immunity and that it need not register its water claims or pay any filing fees to preserve its water rights. The Klamath Tribe intervened, joining the claims of the United States to the protection of sovereign immunity and also asserting that subjecting the Tribe to an adjudication by the State of Oregon deprived the Tribe of due process because the State had a history of hostility to the Tribe's treaty rights, including its claims to water in the Klamath Basin. The State countered that the McCarran Amendment waived the United States' sovereign immunity and that the Tribe's claims of bias were baseless.
 
 
 5
 After hearing cross-motions for summary judgment, the district court held that in enacting the McCarran Amendment, Congress had waived sovereign immunity on behalf of the United States and Klamath Tribe and consented to their participation in the Klamath Basin adjudication. The court held that the United States could be compelled to pay filing fees for the adjudication, but could not be forced to register all of its water claims throughout the state. The court further held that an 1864 Treaty between the United States and the Tribe precluded the State from requiring filing fees from the Tribe,[1] but that otherwise subjecting the Tribes to the state procedure did not violate their due process rights.
 
 
 6
 After the court issued its summary judgment decision, United States v. Oregon Water Resources Dept., 774 F.Supp. 1568 (D.Or.1991), the Klamath Allottees Water Users Association intervened, claiming to hold the same rights as the Tribe. Members of the Association own property that was once held in trust for the Tribe, but later transferred to individual tribe members in fee pursuant to federal statutes. Without explanation, the district court declined to extend the ruling to the Association's members. These appeals followed, raising the issues we left undecided in Adair. We affirm the summary judgment, with the exception of the district court's ruling that the United States can be required to pay filing fees. We further dismiss the Association's appeal for lack of jurisdiction.
 
 II
 Sovereign Immunity
 
 7
 Unless the McCarran Amendment waived the sovereign immunity of the federal government and the Tribe, neither may be required to participate in a state adjudication in order to preserve water rights that have accrued under federal law. See Colorado River Water Conservation District v. United States, 424 U.S. 800, 809-13, 96 S.Ct. 1236, 1242-44, 47 L.Ed.2d 483 (1976). The McCarran Amendment provides:
 
 
 8
 Sec. 666. Suits for adjudication of water rights
 
 
 9
 (a) Joinder of United States as defendant; costs
 
 
 10
 Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source.... The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: Provided, That no judgment for costs shall be entered against the United States in any such suit.
 
 
 11
 (b) Service of summons
 
 
 12
 Summons or other process in any such suit shall be served upon the Attorney General or his designated representative.
 
 
 13
 43 U.S.C. Sec. 666.
 
 
 14
 The United States argues that Oregon's mass adjudication scheme is not the sort of "comprehensive suit" contemplated by the statute because much of the proceedings are before an administrative agency rather than a court and because the adjudication is insufficiently comprehensive. In order to decide whether Congress intended to waive the United States' sovereign immunity for water rights proceedings such as those held under Oregon's statute, we must examine both the McCarran Amendment and the Oregon statute, paying particular attention to their historical contexts.
 
 
 15
 In the nineteenth century, water rights in Oregon were acquired by appropriation or riparian right, or accrued to the United States and Indian Tribes under federal law as federal reserved rights. See 1 Robert E. Beck, Waters and Water Rights Sec. 8.02(c) (1991). Under an appropriation system, as such systems developed in the West, the first party to divert water for a beneficial use has the right to continue to divert that amount of water without interference from subsequent appropriators so long as the water continues to be put to beneficial use. In case of shortages, the entire share of the most recent appropriator is lost before the share of the next latest appropriator is diminished. Under such a system, the date of appropriation and the amount of water appropriated are the critical facts in the determination of the relative rights of water users.
 
 
 16
 As was traditional in Western states, the relative rights of various claimants to water from a river system were determined piecemeal, as conflicts arose, in traditional lawsuits in equity. See 2 Beck, supra Sec. 15.01; Samuel C. Wiel, Water Rights in the Western States Sec. 624 (3d ed. 1911). As the West became more populated, conflicts over water rights increased. As the interrelation of water rights became more apparent, a dilemma emerged: the nature of traditional civil litigation made joinder of the hundreds or thousands of claimants to a river system extremely cumbersome and inefficient,[2] while less comprehensive adjudications were of little value. As the Supreme Court noted in Pacific Live Stock Co. v. Oregon Water Bd., 241 U.S. 440, 449, 36 S.Ct. 637, 641-42, 60 L.Ed. 1084 (1916), in an adjudication of water rights,
 
 
 17
 the rights of the several claimants are so closely related that the presence of all is essential to the accomplishment of its purposes, and it hardly needs statement that these cannot be attained by mere private suits in which only a few of the claimants are present, for only their rights as between themselves could be determined.
 
 
 18
 As it became clear that the necessary scope of comprehensive water rights adjudication could not be accommodated by traditional litigation procedures, Western states began to develop alternate, statutory adjudication systems for the mass determination of the rights of all claimants in a river system. See 2 Beck, supra Sec. 15.01; 2 Wells A. Hutchins, Water Rights in the Nineteen Western States 447-48, 451-70.
 
 
 19
 In 1909, Oregon created its present statutory system for the mass adjudication of surface water rights. After 1909, water rights could only be acquired through a permit system established by the statute. Or.Rev.Stat. Sec. 537.120. However, all water rights that had vested prior to 1909, but had never been subject to a judicial determination, have been left intact as "undetermined vested rights." Id. at Secs. 536.007(11), 539.010. The statute requires that every person or entity claiming an undetermined vested right must file a "registered statement" describing the claim and including the information necessary to determine the claimed vested or reserved right. Id. at Sec. 539.240(1).[3] The purpose of the registration is to preserve evidence of pre-1909 claims until those claims are subject to adjudication under the statute. The registration statement must be accompanied by a fee that is calculated according to the type and extent of the water's use. Id. at Sec. 539.081.
 
 
 20
 Upon petition by a claimant, or on its own initiative, the Oregon Water Resources Department may commence the adjudication of the rights of all claimants to a river or stream. Or.Rev.Stat. Sec. 539.021. Notice must be given to all interested parties. Id. at Secs. 539.030, 539.040(2). Those claimants who have already been issued water certificates through the permit system are not required to participate in the adjudication in order to preserve their rights as already determined. Id. at Sec. 539.100. However, those with undetermined claims to the water of the system are required to appear and submit proof of their claims before the OWRD. The OWRD accepts claims and objections to claims, surveys the river system, takes evidence and holds hearings regarding contested claims. Id. at Secs. 539.070, 539.100, 539.110, 539.120. After these hearings, the OWRD makes findings of fact and an order determining the parties' water rights. Id. at Sec. 539.130. This order is effective upon issuance unless a party wishes to contest the order and files a bond. Id. at Sec. 539.130(4). After the order is filed, a judicial hearing is scheduled and notice of that hearing is given to the participants. Id. at Sec. 539.130. Parties objecting to the department's order must file written exceptions with the court in order to preserve their objections. Id. at Sec. 539.150. If no objections are filed, the court must enter a judgment affirming the order. Id. at Sec. 539.150(3). Otherwise, a hearing is held at which contesting parties may offer evidence as in a normal civil case. Id. at Secs. 539.150(1), 539.150(3). The court may remand the case to the OWRD or other referee for further findings, followed by another judicial hearing. Id. at Sec. 539.150(3). At the final judicial hearing, the court reviews the exceptions and then enters a judgment affirming or modifying the order as it considers proper. Id. at Sec. 539.150(4). This judgment is appealable to the Oregon Court of Appeals in the same manner as any other civil judgment. Id.
 
 
 21
 The system adopted by Oregon at the turn of the century served as a model for Arizona, California, Nevada and Texas. See 2 Hutchins, supra at 456-57. By the time the McCarran Amendment was passed, most Western states had adopted some statutory procedure for the mass adjudication of water rights. See 1 id. at 302-03; infra notes 7-8. While these statutory adjudications seemed to promise an end to the confusing and conflicting adjudication of water rights in multiple cases, the system was impaired by the refusal of the federal government to participate. Since the United States had large landholdings and extensive reserved water rights in the West, its claims of sovereign immunity significantly diminished the value of the comprehensive state adjudications. Congress sought to remedy this problem by enacting the McCarran Amendment in 1952. See S.Rep. No. 755, 82d Cong., 1st Sess. 4-6 (1951).
 
 
 22
 Against this background, we must consider the United States' contention that the McCarran Amendment does not and was not meant to extend to Oregon's statutory procedure for adjudicating water rights in river systems.
 
 
 23
 * Suit or Administrative Proceeding
 
 
 24
 The United States argues that Oregon's adjudication of water rights does not constitute a "suit" but rather an "administrative proceeding" outside the plain language of the McCarran Amendment. The Supreme Court heard a similar argument regarding the proper characterization of Oregon's water rights adjudication process in Pacific Live Stock Co. v. Oregon Water Bd., 241 U.S. at 440, 36 S.Ct. at 637. In that case, the plaintiff sought a declaration that Oregon's statute violated the due process clause of the Fourteenth Amendment because it permitted water rights to be adjudicated by an administrative agency rather than a court. The Court wrote:
 
 
 25
 A serious fault in this contention is that it does not recognize the true relation of the proceeding before the board to that before the court. They are not independent or unrelated, but parts of a single statutory proceeding, the earlier stages of which are before the board and the later stages before the court.... [T]he board merely paves the way for an adjudication by the court of all the rights involved. As the Supreme Court of the State has said, the board's duties are much like those of a referee.
 
 
 26
 Id. at 451. In the end, water rights are assigned according to a judgment of a court which has held hearings in which the United States has been joined as a defendant. That an administrative agency, magistrate, referee or special master should "pave the way for an adjudication by the court" does not make the label "suit" inappropriate.
 
 
 27
 The United States argues, however, that we are required to construe narrowly the language of any statute waiving sovereign immunity and that an appropriately narrow construction of the McCarran Amendment allows joinder of the United States only in traditional lawsuits initiated in court and tried exclusively before a judge.[4] In United States v. Idaho, --- U.S. ----, ----, 113 S.Ct. 1893, 1896, 123 L.Ed.2d 563 (1993), the Supreme Court emphasized that "waivers of federal sovereign immunity must be 'unequivocally expressed' in the statutory text." The plain language of the McCarran Amendment, however, expressly waives immunity. The question in this case is whether the case at bar is one of those adjudications, described in the provision, to which this express waiver applies. Although an examination of Congress' purposes and the historical context of the statute may not serve to waive immunity when the text of the statute fails to do so unequivocally, see United States v. Nordic Village, Inc., 503 U.S. 30, ----, 112 S.Ct. 1011, 1016, 117 L.Ed.2d 181 (1992), the "scope of such a waiver can only be ascertained by reference to underlying congressional policy." Franchise Tax Bd. v. United States Postal Service, 467 U.S. 512, 521, 104 S.Ct. 2549, 2554, 81 L.Ed.2d 446 (1984). The Supreme Court has repeatedly looked to indicia of Congressional intent in order to construe the scope of the unequivocally expressed waiver of immunity in the McCarran Amendment. See Arizona v. San Carlos Apache Tribe, 463 U.S. 545, 564-65, 103 S.Ct. 3201, 3212-13, 77 L.Ed.2d 837 (1983) (examining purposes of the Amendment in holding that it waives Indian sovereign immunity in all states); Colorado River, 424 U.S. at 810-812, 96 S.Ct. at 1242-44 (holding that the objectives and legislative history of McCarran Amendment support applying waiver to adjudication of federal reserve water rights held by the United States in trust for Indian Tribes); United States v. District Court for Eagle County, 401 U.S. 520, 525, 91 S.Ct. 998, 1002-03, 28 L.Ed.2d 278 (1971) (looking to legislative history to determine how "comprehensive" Congress required the adjudications to be in order to qualify for waiver of immunity).
 
 
 28
 Thus, we must look to the Amendment's historical context and purposes to evaluate the United States' argument that the McCarran Amendment applies only to "traditional" civil lawsuits. The United States points out that at the time of the McCarran Amendment's passage, Oregon, like most Western states, continued to allow water rights to be adjudicated in traditional civil suits notwithstanding its statutory adjudication scheme. See Or.Rev.Stat. Sec. 539.021(2); 2 Hutchins, supra at 63-67. Based on this observation, the United States argues that Congress meant to waive immunity to joinder in these traditional adjudications, but not to participation in statutory adjudications in which administrative agencies play a central role.
 
 
 29
 This argument ignores that Congress limited its waiver to "comprehensive water right adjudication[s]." United States v. Idaho, --- U.S. at ----, 113 S.Ct. at 1894. As the Supreme Court noted in Colorado River,
 
 
 30
 The consent to jurisdiction given by the McCarran Amendment bespeaks a policy that recognizes the availability of comprehensive state systems for adjudication of water rights.... As has already been observed, the Colorado Water Rights Determination and Administration Act established such a system for the adjudication and management of rights to the use of the State's waters.
 
 
 31
 424 U.S. at 819, 96 S.Ct. at 1247. Thus, the Supreme Court considered the statutory scheme adopted by Colorado to be one of the "comprehensive state systems" Congress had in mind when passing the McCarran Amendment. The Colorado system does not rely upon traditional equity lawsuits for comprehensive river adjudications. Rather, like the statutory scheme in Oregon, Colorado's system involves an initial adjudication by nonjudicial officers, known as "Water Referees," subject to review by a state court. See Colo.Rev.Stat.Ann. Secs. 37-92-101 et seq. (1974); see also 6 Beck, supra at 65-66. As the Supreme Court explained, "[e]ach month, Water Referees in each Division rule on applications for water rights filed within the preceding five months or refer those applications to the Water Judge of their Division. Every six months, the Water Judge passes on referred applications and contested decisions by Referees." 424 U.S. at 804, 96 S.Ct. at 1240 (citations omitted). Thus, when the Supreme Court held that Colorado's system was the sort of comprehensive adjudication contemplated by the McCarran Amendment, it recognized that Congress had in mind not only traditional suits in equity but also hybrid adjudications taking advantage of the expertise of nonjudicial officials.
 
 
 32
 In fact, the active participation of administrative agencies is at the core of most of the "comprehensive state systems for adjudication of water rights" contemplated by the McCarran Amendment. While the traditional civil lawsuits may remain viable devices for the comprehensive adjudication of rivers with a small number of claimants, by 1952 it was clear that they were not well-suited for comprehensive adjudication of the rights in large rivers. See Pacific Live Stock, 241 U.S. at 449, 36 S.Ct. at 641-42. Comprehensive adjudication of such river systems became practicable after the creation of the complex statutory procedures in the first half of this century. See 2 Beck, supra Sec. 15.01; 2 Hutchins, supra at 444-47. A central feature of these statutory procedures is the involvement of administrative agencies to make an initial determination of the hundreds or thousands of claims filed. 2 Beck, supra Sec. 15.01; 1 Hutchins, supra at 302; 2 id. at 448-51. When Congress consented to the joinder of the United States in comprehensive lawsuits, we presume that it had in mind these statutory procedures which made large scale comprehensive adjudications possible.[5] See Colorado River, 424 U.S. at 819, 96 S.Ct. at 1247.
 
 
 33
 It may be, however, the Oregon's system is aberrational, relying too heavily on the work of the administrative agency to be considered among those comprehensive adjudications to which the McCarran Amendment applies. However, as the State points out, at the time the McCarran Amendment was passed, Oregon's adjudicatory scheme was firmly established in its present form and had been duplicated in Arizona, California and Nevada (the home state of Senator McCarran, author of the Amendment).[6] State water agencies or referees in four more states played essentially the same role as the Oregon Water Resources Department, except that the proceedings were initiated in court and then transferred to the agency or referee for investigation and preliminary determination.[7] We agree with the State that whether the case is initiated in court and then referred to an agency for administrative proceedings, or is initiated through an administrative procedure before being reviewed by a court is not a material distinction for the purposes of the McCarran Amendment. Both sorts of systems were in place when Congress enacted the waiver. There is no reason to think that Congress meant its waiver to turn on such a technical distinction. See Eagle County, 401 U.S. at 525, 91 S.Ct. at 1002-03. We decline to adopt an interpretation of the McCarran Amendment that would render it inapplicable to the comprehensive adjudication schemes of so many Western states when it was passed.[8]
 
 B
 Comprehensiveness
 
 34
 The United States also argues that even if Oregon's proceedings amount to a "suit" within the meaning of the McCarran Amendment, they are not sufficiently comprehensive to fall under the provision because the rights of some claimants are not subject to attack and because groundwater rights are not decided in the same proceeding.
 
 
 35
 * Absent Parties
 
 
 36
 Under the Oregon statute, some aspects of the water rights determined through the permit process after 1909 or through prior adjudication are considered to be conclusively determined and not subject to contest in the Klamath Basin adjudication. See Or.Rev.Stat. Sec. 537.270 (water right certificate issued through permit process or after statutory adjudication is to be considered "conclusive evidence of the priority and extent of the appropriation therein described"); id. at Sec. 539.100 (party not asserting an undetermined vested right or contesting such a right need not participate in statutory adjudication). The United States contends that this makes the adjudication less than comprehensive.
 
 
 37
 In United States v. District Court for Eagle County, 401 U.S. at 520, 91 S.Ct. at 1000 and its companion case, United States v. District Court for Water Div. No. 5, 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971), the Supreme Court considered a similar attack on the Colorado comprehensive adjudication process. Under the statute, Colorado periodically conducted "supplemental water adjudications" to determine the rights of those claiming to have acquired water rights since the last adjudication of the river system. The United States argued that the adjudication was not comprehensive because water rights determined in previous adjudications were not subject to redetermination. The Court in Eagle County stated "[w]e think that argument is extremely technical; and we decline to confine 43 U.S.C. Sec. 666 so narrowly." 401 U.S. at 525, 91 S.Ct. at 1002-03. The Court went on to explain in Water Div. No. 5 that the adjudication was general because, "[t]he present suit ... reaches all claims, perhaps month by month but inclusively in the totality." 401 U.S. at 529, 91 S.Ct. at 1005.
 
 
 38
 We reject the government's argument in this case as well. As was true in Eagle County, all existing water rights claims in the river system will have been determined when the adjudication is finished. Congress was concerned that the United States not be subjected to piecemeal, private water rights litigation. See Eagle County, 401 U.S. at 525, 91 S.Ct. at 1002-03; Water Div. No. 5, 401 U.S. at 529, 91 S.Ct. at 1004-05. The comprehensiveness standard requires the consolidation of existing controversies, not the reopening of settled determinations.
 
 
 39
 The United States and the Tribe argue, however, that Oregon's statutory adjudication will not sufficiently protect their water rights because they will not be allowed to challenge the water rights certificates issued through the permit system. However, the Supreme Court responded to this concern in Eagle County, observing that
 
 
 40
 [t]he absence of owners of previously decreed rights may present problems going to the merits, in case there develops a collision between them and any reserved rights of the United States. All such questions, including the volume and scope of particular reserved rights, are federal questions which, if preserved, can be reviewed here after final judgment by the [state] court.
 
 
 41
 401 U.S. at 527, 91 S.Ct. at 1003 (footnote omitted).
 
 2
 Groundwater
 
 42
 Because the Klamath Basin adjudication does not attempt to determine the rights of claimants to groundwater in the Basin, the United States argues that the proceedings are not an "adjudication of rights to the use of water of a river system or other source." 43 U.S.C. Sec. 666(a). Arguing that the ground and surface waters of the region are hydrologically interrelated, the United States contends that the failure to include groundwater claims deprives the adjudication of the comprehensiveness intended by Congress.
 
 
 43
 The text of the Amendment lends little support to the United States' position. On its face, the statute applies to the "water of a river system or other source." Groundwater may be included as an "other source," but the use of "or" strongly suggests that the adjudication may be limited to either a river system or some other source of water, like groundwater, but need not cover both. For the United States' argument to succeed, we must read "river system" to include not only the water of the river, but hydrologically-related groundwater systems as well.
 
 
 44
 In support of this interpretation, the United States refers to cases stating that the Amendment's waiver is limited to "general" or "comprehensive" adjudications. See, e.g., United States v. Idaho, --- U.S. at ----, 113 S.Ct. at 1894; Dugan v. Rank, 372 U.S. 609, 618, 83 S.Ct. 999, 1005, 10 L.Ed.2d 15 (1963). These cases make clear that the adjudication must include the undetermined claims of all parties with an interest in the relevant water source. However, these cases do not address the proper definition of the relevant water source and do not decide if groundwater must be included in an adjudication of a "river system." The United States can point to no other case law, statutory text or legislative history that specifically requires groundwater to be adjudicated as part of the comprehensive adjudication of a "river system."
 
 
 45
 The United States argues instead that the purposes of the Amendment are best served by an interpretation that requires the adjudication of all hydrologically-related water sources. We agree that the McCarran Amendment was motivated in large part by the recognition of the interconnection of water rights among claimants to a common water source and the desire to avoid piecemeal adjudication of such rights. However, we do not believe that Congress intended to carry the requirement of comprehensiveness as far as the United States would have us do.
 
 
 46
 The Supreme Court addressed the scope of the comprehensiveness requirement in Eagle County, where the State of Colorado attempted to adjudicate the water rights of claimants to the Eagle River and its tributaries. 401 U.S. at 521, 91 S.Ct. at 1000. The Eagle River is itself a tributary of the Colorado River. Id. The United States argued that because the Eagle was hydrologically related to the Colorado, a comprehensive adjudication under the McCarran Amendment must include an adjudication of the entire Colorado River. The Court rejected this contention as "almost frivolous." Id. at 523, 91 S.Ct. at 1001. "No suit by any State could possibly encompass all of the water rights in the entire Colorado River which runs through or touches many States. The 'river system' must be read as embracing one within the particular State's jurisdiction." Id. This discussion suggests that, contrary to the United States' assertions, the comprehensiveness requirement does not mandate that every hydrologically-related water source be included in the adjudication.
 
 
 47
 We conclude that while the adjudication must avoid excessively piecemeal litigation of water rights, it need not determine the rights of users of all hydrologically-related water sources. As one authority has noted:
 
 
 48
 [s]cientists have long delighted in pointing out to lawyers that all waters are interrelated in one continuous hydrologic cycle. As a result, it has become fashionable to argue that an effective legal regime should govern all forms and uses of water in a consistent and uniform manner. The law is otherwise.
 
 
 49
 1 Beck, supra Sec. 6.02 (footnotes omitted).
 
 
 50
 One of the ways in which the law has traditionally ignored the exhortation of the scientists is by treating ground and surface water as distinct subjects, often applying separate law to each. While rights to surface water in the Western states have generally been allocated under the appropriation doctrine, the rights to groundwater were traditionally riparian. See 3 Beck, supra Secs. 20.03-20.04; 2 Wiel, supra Secs. 1039-42. Under the traditional groundwater doctrines of absolute dominion, the American reasonable use rule, and the correlative rights rule, the priority of first use of the groundwater is irrelevant to establishing the relative rights of users of the groundwater. See 3 Beck, supra Sec. 20.07(b)(2). Thus, a major function of the statutory comprehensive adjudications is made unnecessary--there is no need to establish the relative priority of all users' claims in order to define each user's rights. The United States is correct in arguing that an increased recognition of the relationship between ground and surface water has led some states to attempt better coordination between the allocation of surface and groundwater rights, see 3 Beck, supra Sec. 24.01(b), but that recognition was still emerging at the time the McCarran Amendment was passed.[9] See id.; 2 Hutchins, supra at 634-53. While the trend has been toward a greater legal recognition of the connection between ground and surface waters, that recognition is too recent and too incomplete to infer that Congress intended to require comprehensive stream adjudications under the McCarran Amendment to include the adjudication of groundwater rights as well as rights to surface water.
 
 
 51
 The Tribe and the United States note that the use of groundwater in the Klamath Basin may have a direct effect on the availability of water to fulfill the reserved water rights guaranteed to them under federal law. They note that the State's distribution of groundwater rights may have the effect of interfering with these federal water rights. The appellants raise legitimate concerns about the relationship between federal reserve water rights in a river and the distribution of water rights in hydrologically related groundwater. However, these concerns go to the merits of the adjudications. As the Supreme Court has noted, in administering water rights the State is compelled to respect federal law regarding federal reserved rights and to the extent it does not, its judgments are reviewable by the Supreme Court. See Eagle County, 401 U.S. at 525-26, 91 S.Ct. at 1002-03.
 
 
 52
 For these reasons, we hold that the Klamath Basin adjudication is in fact the sort of adjudication Congress meant to require the United States to participate in when it passed the McCarran Amendment. Accordingly, federal sovereign immunity imposes no bar to the United States' participation in that process.
 
 III
 Assessing Fees Against the United States
 
 53
 The McCarran Amendment provides that notwithstanding its consent to the joinder of the United States in comprehensive water rights adjudications, "no judgment for costs shall be entered against the United States in any such suit." 43 U.S.C. Sec. 666(a). The District Court held that the United States was liable for certain filing fees required by Or.Rev.Stat. Sec. 539.081, notwithstanding the McCarran Amendment's "cost" proviso because the statute assessed "fees" rather than taxing "costs." However, since the district court's decision, the Supreme Court decided United States v. Idaho, --- U.S. at ----, 113 S.Ct. at 1893, in which the Court held that the McCarran Amendment did not permit Idaho to require the United States to pay filing fees essentially identical to those at issue in this case. See id. at ---- - ----, 113 S.Ct. at 1897-98. On appeal, the State concedes that this decision controls and requires the reversal of the district court's decision on this issue.
 
 IV
 Registration Statements
 
 54
 The State argued unsuccessfully below that the United States could be required to file registration statements describing its claims to waters outside of the Klamath Basin, as provided by Or.Rev.Stat. Sec. 539.240. This provision requires those claiming undetermined vested rights or federal reserve rights to file a registration statement of all claims by December 31, 1992. Id. The information gathered through the registration process preserves evidence necessary for future comprehensive adjudications. Without detracting from the merits of the State's registration scheme, we are compelled to hold that the United States has not consented to be a part of this process.
 
 
 55
 In United States v. Idaho, the Court held that with the exception of procedural rules imposing costs or fees on the United States, "the McCarran Amendment submits the United States generally to state adjective law." Id. at ----, 113 S.Ct. at 1897. Oregon argues that the registration statement requirements are a part of the state adjective law governing the procedure by which comprehensive water rights adjudications are conducted. While the information obtained by the registration system regarding claims not yet at issue in any proceeding may be useful in future comprehensive adjudications, the process cannot accurately be described as part of the state's adjective law for the adjudication of water rights claims. There is no relation between the deadline for filing registration statements and the commencement of the statutory adjudication. The claims thus registered will only be adjudicated "upon the motion of the director or, in the discretion of the director, upon receipt of a petition from one or more appropriators of surface water." Or.Rev.Stat. Sec. 539.021. It is thus possible that many years will pass before a registered claim is adjudicated, if it is ever adjudicated at all. The connection between registration and adjudication is too tenuous for the registration provisions to be characterized as part of the adjudications to which the United States has consented to be joined.
 
 
 56
 In the absence of a waiver of sovereign immunity, the State may not require the United States or the Tribe to register water rights claims prior to the adjudication of those claims, nor may it prejudice those claims if no registration statements are filed.
 
 V
 The Klamath Tribe's Due Process Claim
 
 57
 The Klamath Tribe claims that requiring it to submit to the Klamath Basin adjudication would deprive it of due process because the state agencies involved in adjudicating their claims have shown a persistent bias against Tribal treaty rights. The district court found that the Tribe had failed to present sufficient evidence of bias to substantiate this claim and entered summary judgment against the Tribe on this issue. We agree and affirm.
 
 
 58
 The due process clause of the Fourteenth Amendment guarantees the Tribes a fair trial before a fair tribunal, whether it be an administrative agency or a court. See Withrow v. Larkin, 421 U.S. 35, 46, 95 S.Ct. 1456, 1463-64, 43 L.Ed.2d 712 (1975). In evaluating the Tribe's claim of biased decisionmaking, we must ask whether the situation is one "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Id. at 47, 95 S.Ct. at 1464.
 
 
 59
 The Tribe presented evidence to show that the Oregon Department of Justice (ODOJ) has on several occasions argued against the existence of some treaty rights held by the Klamath Tribe.[10] In particular, the Tribe points to United States v. Adair, 723 F.2d at 1396, where the ODOJ represented the State of Oregon in a suit instituted by the United States for a declaration of its rights and the rights of the Klamath Tribe to waters in a portion of the Klamath River Basin. In that case, the ODOJ vigorously argued, among other things, that the hunting and fishing rights guaranteed by an 1864 Treaty between the United States and the Tribe did not carry with them an implied reservation of water rights or that, even if they did, those rights were terminated when the federal government terminated supervision of the Tribe in 1954. 723 F.2d at 1408, 1411. We held that the Tribe continued to possess a senior, reserved water right sufficient to support the Tribe's hunting and fishing rights. Id. at 1410-11, 1414. The quantification of these rights was left to the State of Oregon's statutory adjudication process. Id. at 1399. Now that the State of Oregon has begun a statutory adjudication of the Klamath River Basin, as contemplated by our decision in Adair, the Tribe argues that the quantification process is tainted by bias due to the ODOJ's past positions opposing the existence of the Tribe's treaty rights.[11]
 
 
 60
 In order to prevail in its claim, the Tribe must show an unacceptable probability of actual bias on the part of those who have actual decisionmaking power over their claims. See Withrow v. Larkin, 421 U.S. at 47, 95 S.Ct. at 1464-65. Contrary to the apparent position of the Tribe, it is not enough to show that the State of Oregon, through the acts of certain departments or officials, has taken positions adverse to the Tribe's claims in this case. While courts have traditionally been sympathetic to the fear that tribal treaty rights will receive "inhospitable treatment" in state courts, the Supreme Court has held that this danger in itself is not enough to warrant reading the McCarran Amendment to exclude Indian water rights from comprehensive state adjudications. Arizona v. San Carlos Apache Tribe, 463 U.S. at 566-67, 103 S.Ct. at 3213-14. Nor is this generalized suspicion of inhospitable treatment enough, in itself, to create a due process bar to subjecting tribal water rights to state adjudication.
 
 
 61
 Even assuming, arguendo that prior litigating positions reveal that ODOJ is biased against the Tribe's water rights claims,[12] the Tribe must connect these prior actions to the tribunal that will adjudicate its claims. See Withrow, 421 U.S. at 47, 95 S.Ct. at 1464-65; Hammond v. Baldwin, 866 F.2d 172, 177 (6th Cir.1989). In order to make this connection, the Tribe asserts that ODOJ will provide legal advice to the Oregon Water Resources Department during its preliminary quantification of the Tribe's water rights. The Tribe acknowledges that the final quantification of water rights will be rendered by a state court, but asserts that the court will make this ruling on the basis of an administrative record developed by OWRD which, it argues, is tainted by its connection with the ODOJ.
 
 
 62
 We hold that this showing is insufficient to demonstrate an unacceptable probability that the decisionmakers in the Klamath Basin adjudication will be biased against the Tribe's claim. The Tribe has failed to show that the ODOJ will have any significant role to play in the adjudication or any impact on its outcome. The legal issues with respect to the Tribe's rights have already been decided by this court and we must presume that they will be followed by OWRD and the state courts. See Withrow v. Larkin, 421 U.S. at 47, 95 S.Ct. at 1464 (courts must entertain a "presumption of honesty and integrity in those serving as adjudicators"). All that is left for the tribunals in the Klamath Basin adjudication is the quantification of those rights, a fact-intensive inquiry that will be undertaken initially by the OWRD. The Tribe has not shown how the ODOJ's prior hostility to certain Treaty rights could affect this factual determination, a determination that is ultimately enforced only after review by state court judges whose integrity has not been questioned by the Tribe.
 
 
 63
 Because the evidence proffered by the Tribes does not sufficiently show an unacceptable probability of actual bias by the actual decisionmakers in the Klamath Basin adjudication, the district court properly granted summary judgment in favor of the State.
 
 VI
 Allottees' Claim
 
 64
 Appellant Klamath Allottees Water Users Association appeals from the district court's denial of its motion to amend the court's summary judgment ruling to extend the relief granted the Tribe to the members of the Association. The Association claimed that its members enjoyed the same sovereign immunity as the Tribe[13] and that the 1864 Treaty which bars the State from imposing filing fees on the Tribe also exempted the members of the Association.
 
 
 65
 The Association's appeal comes before this court in an unusual posture. The Association moved to intervene late in the litigation. The Association filed its motion with attached complaint in intervention after the other parties had already filed cross-motions for summary judgment. The district court issued its summary judgment ruling before entertaining the Association's motion to intervene. However, the district court held off entering a final judgment until it could hear the Association's motion. The motion to intervene was granted without objection, after which the Association filed its motion to amend the court's summary judgment ruling. The other parties filed supporting and opposing memoranda.[14] Without explanation, the court denied the Association's motion in a minute order. When the district court entered final judgment, it noted having denied the motion, but did not otherwise indicate that judgment was being entered on the merits of the Association's complaint in intervention. The Association filed a timely notice of appeal.
 
 
 66
 The Association's motion to amend the summary judgment ruling adopted the summary judgment motion of the Tribe. C.R. 97, at 8. The district court might have considered the Association's motion as a motion for summary judgment and the State's opposition to the motion as a cross-motion for summary judgment against the Association. If this had been the case, the district court's minute order might have been read as denying summary judgment to the Association and granting it to the State. However, it is not at all clear that this is what the district court meant to do.
 
 
 67
 While all the parties to the appeal treat the district court's resolution of the Association's motion as a judgment on the merits of its claims, it is difficult to understand how the district court could have made such a determination based upon the state of the record. The record is devoid of certain facts that might be relevant to the merits of the Association's claims. For instance, it is not clear whether members of the Association are also members of the Tribe or are non-Indians who acquired their land from original Indian allottees. See Brief of Appellant Klamath Allottees Water Users Association, at 9 n. 9. Nor does the record show whether the allottees came to have title to the allotments in fee as a result of the General Allotment Act, 25 U.S.C. Sec. 331 et seq., or under the Klamath Termination Act, 25 U.S.C. Sec. 564 et seq. See Reply Brief of Appellant Klamath Allottees Water Users Association, at 1. Such distinctions may be important in the eventual adjudication of the members' rights. In the face of an incomplete record, we are reluctant to reach out to decide the merits of the Association's complaint.
 
 
 68
 It appears that the district court, having granted the Association's motion for leave to intervene and file a complaint in intervention, merely denied the Association's motion to amend the court's judgment to extend the relief granted the Tribe to the Association's members, leaving the Association's complaint in intervention unadjudicated. Because the district court's order is not a final judgment disposing of the Association's complaint in intervention, the appeal is dismissed for lack of jurisdiction. 28 U.S.C. Sec. 1291.
 
 
 69
 In Nos. 92-36983, 92-36985 and 92-37001, the district court's summary judgment is REVERSED with respect to its ruling on the imposition of filing fees on the United States and is AFFIRMED in all other respects. The appeal in No. 92-36987 is DISMISSED and the case is REMANDED to the district court for further proceedings.
 
 
 
 [1]
 This ruling has not been appealed
 
 
 [2]
 For instance, in Salt Lake City v. Anderson, 106 Utah 350, 148 P.2d 346 (1944), a traditional suit in equity to adjudicate rights in the Jordon River grew to over 10,000 parties
 
 
 [3]
 Failure to register a claim creates a rebuttable presumption that the claim has been abandoned. Or.Rev.Stat. Sec. 539.240(3)
 
 
 [4]
 The Tribe argues that we are required to narrowly construe the McCarran Amendment so as to preclude its joinder in this case in order to avoid the Constitutional questions they raise about the fundamental fairness of Oregon's adjudicative system. This argument is without merit. While "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality," International Ass'n of Machinists v. Street, 367 U.S. 740, 749, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961) (emphasis added), we know of no case requiring us to construe a federal statute so as to avoid reaching a constitutional challenge to a completely different state statute or procedure
 
 
 [5]
 Obviously, we do not decide in this case whether the McCarran Amendment waives sovereign immunity for adjudications under the statutes of any state but Oregon
 
 
 [6]
 See Ariz.Code Ann. Secs. 75-114--75-122 (1939); Cal.Stat. 1633-39 (Secs. 2525-2774) (1943); Nev.Comp.Laws Secs. 7905-7923 (1929)
 
 
 [7]
 See Mont.Code Ann. Secs. 89-848--89-855 (1947); N.M.Stat.Ann. Secs. 77-406--77-407 (1941); Utah Code Ann. Secs. 100-4-3--100-4-15 (1943); Wash.Rev.Code Secs. 7364-7377 (1932)
 
 
 [8]
 The United States also implies that Congress intended that the Western states would amend their statutory adjudication statutes in order to fall within the confines of the narrow interpretation of the statute advocated by the United States. However, there is no indication that Congress believed there to be a problem with the way the Western states were then conducting mass water rights adjudications. To the contrary, the discussions proceeded upon the assumption that the problem was the United States' refusal to participate in the proceedings already existing. See S.Rep. No. 755, 82d Cong., 1st Sess. 5-6 (1951)
 
 
 [9]
 It appears that in 1952, the doctrine of prior appropriation was applied to percolating groundwater in Idaho, Kansas, Nevada, Oklahoma, and Utah, while riparian doctrines were applied to groundwater in Arizona, California, Colorado, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Texas, Washington, and Wyoming. 2 Hutchins, supra at 634-53
 
 
 [10]
 The ODOJ argued against the existence of certain hunting and fishing rights under the 1864 Treaty in Kimball v. Callahan, 493 F.2d 564 (9th Cir.), cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974), and again in Kimball v. Callahan, 590 F.2d 768 (9th Cir.), cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979). In these cases, the position of the Tribes was vindicated. The Tribe also cites Oregon Dept. of Fish & Wildlife v. Klamath Indian Tribe, 473 U.S. 753, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985), a case in which the Oregon Attorney General defended the state Fish and Wildlife Department in a suit by the Tribes seeking an injunction against state interference with their right to hunt and fish on lands ceded to the state in 1901. However, in that case, the Supreme Court held for the State, finding that no such rights existed. Id. at 774, 105 S.Ct. at 3432
 
 
 [11]
 The Tribe also argues that OWRD is likely to underestimate the Tribe's water rights because the State has a policy of "oversubscribing" rivers. The OWRD is authorized to issue water rights certificates to new users even when it is not clear that there will be any water left for the new users once the senior users' rights have been exercised. See Benz v. Water Resources Commission, 94 Or.App. 73, 764 P.2d 594, 598-600 (1988). The Tribe argues that this creates an incentive for the OWRD to minimize the water allocated to senior users in order to assure that water remains for the junior users holding these contingent certificates. The Tribe does not show, however, that any substantial portion of the rivers in the Klamath Basin adjudication are oversubscribed. Nor does it satisfactorily explain why OWRD would prefer the rights of junior users over those of senior users, much less present any evidence that OWRD actually holds such a preference. To the extent such an incentive may exist, the Tribe has not shown that the risk of bias is significant enough to raise a constitutional question
 
 
 [12]
 The Tribe's showing of even this fact is fairly weak. The Tribe's only evidence is the litigating position taken by the ODOJ in a number of cases, all of which were adjudicated over a decade ago. By the Tribe's own admissions, many of the lawyers participating in these cases are no longer active at ODOJ. Tribe's Brief at 26. Nor has the Tribe shown that any of the attorneys or other ODOJ officials involved in these cases will be involved in whatever role the ODOJ will play in the Klamath Basin adjudication
 
 
 [13]
 Although the court had ruled against the Tribe on its sovereign immunity claims, the Association wished to assure itself the benefit of any reversal of these claims upon appeal
 
 
 [14]
 The United States opposed the motion insofar as it argued that the Association's members were entitled to any sovereign immunity. The State opposed the motion in its entirety. The Tribe supported the claims of the Association