UNITED STATES of America,
Plaintiff,

v.

COMMONWEALTH OF PUERTO
RICO and Carlos Padin Bibiloni, Secretary of the Department of Natural
and Environmental Resources, Defendants.

Civil No. 99–2261(HL).

United States District Court,
D. Puerto Rico.

June 5, 2001.

Isabel Munoz–Acosta, U.S. Attorney's
Office District of P.R., Civil Division, Hato
Rey, PR, for plaintiff.

Jose R. Cintron–Rodriguez, Department
of Justice of PR, Federal Litigation Division, San Juan, PR, Margaret N. Strand,
Oppenheimer Wolff Donnelly and Bayh,
Washington, DC, Maria J. Surillo, Com-

monwealth Department of Justice, Federal Litigation Division, San Juan, Daniel Riesel, New York City, for defendants.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

This matter comes before the Court as the result of an attempt by the Commonwealth of Puerto Rico ("Commonwealth") to subject the United States' Naval Station at Roosevelt Roads ("NSRR") to administrative proceedings for the adjudication of NSRR's rights to take water from the Rio Blanco. The Commonwealth conducted its efforts to administer the use of water in the Rio Blanco through its Secretary of the Department of Natural and Environmental Resources ("DNER"), Daniel Pagan Rosa ("Secretary Pagan"), who has since been succeeded by Carlos Padin Bibiloni ("Secretary Padin").[1] In its complaint, the United States alleges that Secretary Padin's attempt to compel NSRR's participation in the DNER's administrative proceedings is illegal. Accordingly, the United States filed its complaint on November 15, 1999, seeking declaratory and injunctive relief.

Both sides have fully briefed the issues in this case. See Dkt. Nos. 22, 23, 39, 41, 48, 54, 58, 71, & 78. For reasons that follow, the Court grants in part the declaratory relief requested by the United States in its Memorandum in Support of Declaratory Judgment and its Response to the Commonwealth's Memorandum of Law.[2] Dkt. Nos. 22 & 41. The Court has asserted jurisdiction under 28 U.S.C. § 1345.

## Background [3]

*1. Origins*

In approximately 1929, the Porto Rico Railway Light and Power Company constructed a still-operating hydro-electric power plant on the Rio Blanco. In 1942, during World War II, the Department of the Navy requested from the Public Service Commission of Puerto Rico a permit to extract 10 cubic feet of water per second[4] from the Rio Blanco. The Public Service Commission granted the Department of the Navy this permit ("1942 permit") on May 26, 1942. The water was to be diverted from the Rio Blanco after its passage through and departure from the hydro-electric power plant belonging to the Porto Rico Railway Light and Power Company. From that time until the present, NSRR has, during normal conditions, taken its water from an intake in the "tailrace" of the hydro-electric power plant.[5]

1. Since January of 2001, the Secretary of the DNER has been Carlos Padin Bibiloni. The Court shall refer to Secretary Pagan only when discussing actions taken by the DNER during his term as Secretary. Secretary Padin appears in the caption of this case pursuant to Fed.R.Civ.P. 25(d)(1). *See also Maria Santiago v. Corporacion De Renovacion Urbana Y Vivienda,* 554 F.2d 1210, 1213 (1st Cir. 1977) (stating that "[i]f officers sued in an official capacity leave office during the pendency of an action, their successors are automatically substituted").

2. The United States requests both declaratory and injunctive relief in its complaint. The Court grants only declaratory relief, however, because the United States requests only the entry of declaratory judgment in its Memorandum in Support of Declaratory Judgment and its Response to the Commonwealth's Memorandum of Law. Dkt. Nos. 22 & 41. Further, the Court considers injunctive relief superfluous in light of the parties' duty to abide by the terms of this declaratory judgment.

3. The parties do not dispute the facts underlying this case.

4. This amounts to roughly 6.46 million gallons per day. The parties agree, however, that NSRR actually uses substantially less than this amount.

5. Just upstream from the hydro-electric power plant is an emergency intake through which NSRR can be supplied water when the plant is not operating.

Subsequently, in July of 1942, the United States Federal Works Agency acquired title to the hydro-electric power plant upon paying for the property pursuant to a judgment of condemnation in the United States District Court for the District of Puerto Rico. The Federal Works Agency then conveyed ownership of the plant to the Puerto Rico Water Resources Authority ("PRWRA").[6] "[I]n consideration of" this transfer, the PRWRA on June 5, 1944, granted to the Department of the Navy "free of charge of monetary consideration . . . permission to continue the use, operation and maintenance of the fresh water supply system" previously constructed at the hydro-electric power plant on the Rio Blanco. *See* Dkt. No. 1, Exhibit 5. This permit ("1944 permit") by its terms was to be "indeterminate and . . . [was not to] be revoked so long as the Government maintain[ed] a Fleet Operating Base at Roosevelt Roads, P.R." *See id.*

It is at this point that the parties' positions diverge sharply. The United States asserts that the 1944 permit is an enforceable contract that justifies NSRR's use of water from the Rio Blanco. In stark opposition, the Commonwealth and Secretary Padin argue that the terms of the 1944 permit grant the Department of the Navy and NSRR no rights to withdraw water from the Rio Blanco, that NSRR's emergency intake on the Rio Blanco is not authorized by the 1944 permit, that the PRWRA had no authority to grant the Department of the Navy a permit to use water from the Rio Blanco, and that the 1944 permit is not a contract at all.

**6.** The PRWRA was the entity that is today known as the Puerto Rico Electric Power Authority ("PREPA").

**7.** 12 P.R. Laws Ann. §§ 1501–1561(1997 & Supp.2000).

## 2. Recent Events

After approximately twenty-five years of half-hearted efforts by the DNER to have NSRR take part in the DNER's water-use permitting processes, Secretary Pagan on July 7, 1999 issued an Order to Cease and Show Cause against NSRR. The order was emitted because of NSRR's alleged violation of the Law of Waters of Puerto Rico of 1976 [7] by its withdrawal of water from the Rio Blanco without a DNER-issued permit. After an administrative process, the DNER on October 29, 1999, handed down an administrative order advising NSRR, among other things, that NSRR was illegally withdrawing water from the Rio Blanco.[8] The order granted NSRR until November 15, 1999 to begin the process of complying with the DNER's permitting requirements and warned that the closure of NSRR's water intake on the Rio Blanco could ensue in the event of noncompliance.

On November 15, 1999, the United States filed this suit, seeking the following declaratory relief: (1) a declaratory judgment that the 1944 permit is in full force and effect and (2) a declaratory judgment that NSRR's payment of money for civil penalties or for past water usage would violate the 1944 permit. In addition, the United States seeks a permanent injunction to prevent the Commonwealth and Secretary Padin from enforcing the DNER's October 29, 1999 administrative order. The United States bases its application for a permanent injunction on (1) the continuing validity of the 1944 permit; (2) the irreconcilability of payments for

**8.** The October 29, 1999 administrative order also purported to charge NSRR approximately $8.8 million for past water usage and $8 million in civil penalties. These fines were imposed without the benefit of meters that the parties later agreed to install to measure effectively NSRR's actual water use.

past water usage and civil penalties with the 1944 permit's provisions; (3) the violation of the Supremacy Clause of the United States Constitution occasioned by the imposition on NSRR of fees or penalties; (4) the violation of the Supremacy Clause effected by the DNER's allegedly discriminatory exercise of its regulatory authority; (5) the administrative order's interference with NSRR's national security functions; and (6) equitable estoppel due to the Commonwealth's willful acquiescence in NSRR's extraction of water from the Rio Blanco for fifty-five years.

### Discussion

The crucial legal issue in this case is not the validity of the 1944 permit or the applicability of the Supremacy Clause. Instead, it is whether the United States' sovereign immunity divests the Commonwealth and Secretary Padin of the authority to compel NSRR's participation in local administrative proceedings involving the 1944 permit. The Court holds that it does.

█ The parties devote the majority of their arguments to the applicability of the McCarran Amendment. *See* 43 U.S.C. § 666(a). The McCarran Amendment provides,

[c]onsent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sover-

eignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: *Provided,* That no judgment for costs shall be entered against the United States in any such suit.

*Id.* The McCarran Amendment is a waiver of the United States' sovereign immunity and allows the United States to be joined as a defendant in any proceeding for the adjudication or administration of water rights "where it appears that the United States is the owner of or is in the process of acquiring water rights." *See* 14 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure § 3656 (3d ed.1998) (quoting 43 U.S.C. § 666(a)). Congress passed the McCarran Amendment for the purpose of allowing states to adjudicate collectively all of the conflicting water rights claims on a source of water, without being hindered by the United States' invocation of its sovereign immunity. *Id. See also Arizona v. San Carlos Apache Tribe,* 463 U.S. 545, 552, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983); *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 808, 819, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

According to the Commonwealth and Secretary Padin, the McCarran Amendment waives the United States' sovereign immunity with respect to the DNER's local administrative proceedings involving the 1944 permit. The focal point of the parties' disagreement is whether the DNER's proceedings satisfy the McCarran Amendment's requirement that local proceedings constitute general stream adjudications. *See, e.g., Colorado River,* 424 U.S. at 819, 96 S.Ct. 1236 (pointing out that the McCarran Amendment "bespeaks a policy that recognizes the availability of

comprehensive state systems for adjudication of water rights"); *United States v. District Court in and for Water Division No. 5,* 401 U.S. 527, 529, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971) (finding a local suit to be a general adjudication because it "reaches all claims, perhaps month by month but inclusively in the totality"); *United States v. District Court in and for the County of Eagle,* 401 U.S. 520, 525, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971) (holding a state adjudication to be general because it involves "the whole community of claims" on the river system); *Dugan v. Rank,* 372 U.S. 609, 618, 83 S.Ct. 999 (setting forth the requirement of "a *general* adjudication of all of the rights of various owners on a given stream") (emphasis in original and omitting internal quotations); *United States v. State of Oregon,* 44 F.3d 758, 765–67 (9th Cir.1994) (holding that local proceedings, even though administrative in nature, qualify as a suit for the adjudication of water rights under the McCarran Amendment). Only if the DNER's proceedings qualify as a general stream adjudication can the McCarran Amendment's waiver of sovereign immunity extend to those proceedings. The Court, however, expressly declines to decide this issue for the reasons set forth below.

■ The McCarran Amendment became law on July 10, 1952, approximately eight years after the issuance of the disputed 1944 permit. The application of the McCarran Amendment to a permit that antedates its passage presents substantial questions regarding the retroactive application of that statute. The Supreme Court has repeatedly made clear that the law does not favor retroactive application of statutes. *Landgraf v. USI Film Products,* 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). *See also Eastern Enterprises v. Apfel,* 524 U.S. 498, 532, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). Indeed, the "presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic .... [S]ettled expectations should not be lightly disrupted." *Id.* at 265.[9] *See also Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997).

■ It is black-letter law that statutory waivers of sovereign immunity are to be construed narrowly. Indeed,

if Congress in fact has enacted legislation consenting to the bringing of a particular kind of suit against the government, ... it may define the terms and conditions under which it is willing to allow the United States to be sued and the general rule long has been that the government's consent to suit is to be strictly interpreted according to the precise terms of the statute waiving the sovereign immunity.

14 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, Federal Practice and Procedure § 3656. The natural extension of this maxim of interpretation is that statutory waivers of sovereign immunity are not to be applied retroactively. *See id.* at § 3654 (stating that "[f]ederal courts have relied on the rule of strict construction of governmental consents to hold that statutory waivers of sovereign immunity should not apply retroactively").

■ In *Landgraf,* the Supreme Court laid down the analysis to be used in determining whether a statute may properly be applied to conduct predating that statute's enactment.

---

9. Further, "[b]ecause it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations." *Id.* at 272.

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. *See also Martin v. Hadix,* 527 U.S. 343, 352, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999).

The answer to the first question, whether Congress expressly prescribed the statute's proper reach, is clear in the instant case. There are no express terms in the McCarran Amendment delineating the statute's proper temporal reach. *See* 43 U.S.C. § 666(a). *See also Mannatt v. United States,* 951 F.Supp. 172, 176 (E.D.Cal.1996), *aff'd,* 185 F.3d 868 (9th Cir.1999), *cert. denied,* 528 U.S. 1138, 120 S.Ct. 983, 145 L.Ed.2d 933 (2000) (holding that the "McCarran Amendment does not contain any express terms indicating that it is to be applied retrospectively[10]"). Thus, the Court must move on to determine whether applying the McCarran Amendment to the 1944 permit would have retroactive effect. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483; *Mannatt,* 951 F.Supp. at 176.

In determining whether a statute, when applied to conduct antedating the statute's enactment, operates retroactively, a "court must ask whether the [statute] attaches new legal consequences to events completed before its enactment." *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483. A statute does not necessarily have retroactive effect, and is thus not disfavored, merely because it applies to "conduct antedating the statute's enactment ... or upsets expectations based in prior law." *Id.* at 269, 114 S.Ct. 1483. Thus, only if the Court finds that the McCarran Amendment's application to the 1944 permit attaches new legal consequences to the 1944 permit will the Court conclude that such application is retroactive and thus disfavored.

According to the Supreme Court, the application of a statute to events completed before its enactment attaches new legal consequences to those events when "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483.[11] In the instant case, applica-

---

**10.** While the Supreme Court in *Landgraf* uses the terms "retroactive" and "retrospective" interchangeably, the Ninth Circuit uses the term "retrospective" to "describe application of a new statute to events that occurred before its enactment, and reserv[es] the term 'retroactive' to describe a statute that, if applied, would attach new legal consequences to conduct or transactions already completed." *Mannatt,* 951 F.Supp. at 176 n. 3. For simplicity's sake, the Court here shall discuss the application of a statute to events predating its enactment without using the term "retrospective" and shall only use the term "retroactive" in the sense in which it is used by both the Supreme Court and the Ninth Circuit.

**11.** The Supreme Court later clarified in *Hughes Aircraft,* 520 U.S. at 947, 117 S.Ct. 1871 that this list is not exclusive. Rather, each item in this list is a *"sufficient,* rather than a *necessary,* condition." (emphasis in original).

tion of the McCarran Amendment to the 1944 permit would attach new legal consequences to the permit and consequently would have retroactive effect. When the PRWRA granted the Department of the Navy "free of charge of monetary consideration ... permission to continue the use, operation and maintenance of the fresh water supply system" on the Rio Blanco, the Navy had the legitimate expectation that its sovereign immunity would prevent it from being subjected to local proceedings with regard to the 1944 permit. In fact, permanent exemption from the Commonwealth's and the DNER's fee structures, permitting processes, and water-allocation decisions could justifiably be considered one of the primary benefits that the Navy derived from entering into the 1944 transaction. Thus, application of the McCarran Amendment to the 1944 permit would impair rights previously possessed by the Navy, increase the Navy's liability for past conduct, and impose new duties on the Navy with respect to transactions already completed.[12]

The Court's conclusion that application of the McCarran Amendment to the 1944 permit would have retroactive effect triggers the strong presumption that the statute must not be so applied. *See Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. This is all the more true because the instant case potentially involves contractual rights.[13]

The Supreme Court stated in *Landgraf* that "[t]he largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Id.* at 271, 114 S.Ct. 1483. Unless clear congressional intent favors retroactive application of the McCarran Amendment, then, the presumption against retroactive application controls.

In the case of the McCarran Amendment, there is simply no ascertainable, much less clear, congressional intent with regard to the retroactive application of the statute. *Mannatt*, 951 F.Supp. at 176–77 and n. 4. In *Mannatt v. United States*, the District Court examined the legislative history of the McCarran Amendment and concluded that there was no basis on which to draw a conclusion that congressional intent supported retroactivity. The District Court explained that the "legislative history does not contain language evidencing clear congressional intent to that regard." *Mannatt*, 951 F.Supp. at 177 (citing S.Rep. No. 82–755 (1951)). In light of the absence of clear congressional intent favoring the retroactive application of the McCarran Amendment, the presumption against applying the statute retroactively prevents its application to the 1944 permit.[14] Thus, the Navy and NSRR retain

---

**12.** Although "[a]pplication of a new jurisdictional rule usually 'takes away no substantial right but simply changes the tribunal that is to hear the case,'" such is clearly not the case here. *See Landgraf*, 511 U.S. at 274, 114 S.Ct. 1483. While the existence of sovereign immunity divests a court of jurisdiction over a suit against the party asserting immunity, a statutory waiver of sovereign immunity is not simply a "new jurisdictional rule." It takes away the substantial right to avoid being sued at all with respect to the subject matter of the statutory waiver. A statute, like the McCarran Amendment, that affects the substantive

rights of the parties, "even though phrased in 'jurisdictional' terms, is as much subject to our presumption against retroactivity as any other." *Hughes Aircraft*, 520 U.S. at 951, 117 S.Ct. 1871.

**13.** Again, though, the parties dispute whether the 1944 permit is a contract at all.

**14.** The District Court in *Mannatt* reached the same conclusion with respect to the McCarran Amendment's retroactive application to a 1924 stipulated decree. *Mannatt*, 951 F.Supp. at 177 (cited in 14 Charles A. Wright,

their sovereign immunity and can not be forced to participate in local proceedings regarding the 1944 permit.[15]

■ WHEREFORE, the Court hereby declares that the Commonwealth and Secretary Padin and his successors are, because of the United States' sovereign immunity, without jurisdiction to compel the Navy or NSRR to participate in local proceedings regarding the 1944 permit or to enforce the DNER's October 29, 1999 administrative order. Declaratory judgment under 28 U.S.C. § 2201 shall be entered accordingly.[16]

**IT IS SO ORDERED.**

Arthur R. Miller and Edward H. Cooper,Federal Practice and Procedure § 3656).

15. The Court expressly declines to decide the validity of the 1944 permit. The Commonwealth and Secretary Padin raise as defenses to this suit questions about both the reach and the validity of the 1944 permit as a contract. These issues are properly left for resolution by a court in the context of a contract suit. The Court takes no position on the viability of such a suit, but it points out that the United States has since 1855 waived its sovereign immunity with respect to suits in the United States Court of Federal Claims "founded ... upon any express or implied contract with the United States ...." 28 U.S.C.A. § 1491(a)(1) (West Supp.2000). *See also* 28 U.S.C. § 1346(a)(2) (providing that the district courts have concurrent jurisdiction with the United States Court of Federal Claims over claims against the United States "not exceeding $10,000 in amount, founded ... upon any express or implied contract with the United States"); Erwin Chemerinsky, Federal Jurisdiction § 9.2.4 (3d ed.1999); 14 Charles A. Wright, Arthur R. Miller and Edward H. Cooper,Federal Practice and Procedure § 3657.

Because the Court finds that the Navy and NSRR have sovereign immunity, the Court

need not decide the United States' claims based on the Supremacy Clause, national security, and equitable estoppel.

16. Although the Supreme Court has not addressed the issue, most lower courts have held that the Anti–Injunction Act, 28 U.S.C. § 2283, applies to "declaratory judgments that would have essentially the same effect as an injunction." Chemerinsky, Federal Jurisdiction § 11.2. Because the United States is the party seeking declaratory judgment, however, the Anti–Injunction Act does not apply to this case. *See Leiter Minerals, Inc. v. United States,* 352 U.S. 220, 225–26, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957) (holding that when the United States is the party seeking an injunction, the Anti–Injunction Act does not apply). Additionally, because neither party has raised the issue of abstention under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), it is waived. *See Swisher v. Brady,* 438 U.S. 204, 213 n. 11, 98 S.Ct. 2699, 57 L.Ed.2d 705 (1978) (cited in Chemerinsky, Federal Jurisdiction § 13.4). *See also Samuels v. Mackell,* 401 U.S. 66, 68–69, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) (stating that the principle of abstention under *Younger v. Harris* applies not only to injunctions but also to declaratory judgments).