# United States Court of Appeals
## For the First Circuit

No. 01-2124

UNITED STATES OF AMERICA,
Plaintiff, Appellee,

v.

COMMONWEALTH OF PUERTO RICO ET AL.,
Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Selya, Circuit Judge.

Roberto J. Sánchez-Ramos, Solicitor General, and Salvador J. Antonetti-Stutts, Director, Federal Litigation Division, Puerto Rico Department of Justice, with whom Vanessa Lugo-Flores, Deputy Solicitor General, Daniel Riesel, Elizabeth Read, and Sive, Paget & Riesel, were on brief, for appellants.
Katherine J. Barton, Attorney, Environment & Natural Resources Division, United States Department of Justice, with whom John C. Cruden, Acting Assistant Attorney General, William B. Lazarus, Attorney, Environment & Natural Resources Division, Guillermo Gil, United States Attorney, Isabel Muñoz Acosta, Assistant United States Attorney, and John Tew, Office of General Counsel, United States Department of the Navy, were on brief, for appellee.

April 24, 2002

**SELYA, Circuit Judge.** In 1952, Congress enacted the McCarran Amendment, 43 U.S.C. § 666, a law that waived the sovereign immunity of the United States in suits for the general adjudication or administration of water rights. This appeal turns on the scope of that waiver.

The underlying litigation flows from Puerto Rico's efforts to impose restrictions on the extraction of water from a river known as the Rio Blanco. The Commonwealth asserts that the McCarran Amendment divests the United States of its sovereign immunity in respect to the compelled participation of the United States Navy in administrative proceedings concerning that subject, commenced pursuant to Puerto Rico's Law of Waters, 12 P.R. Laws Ann. §§ 1501-3015. Disagreeing with this assertion, the Navy asked the United States District Court for the District of Puerto Rico for surcease. The district court stayed the administrative proceedings pending final resolution of the suit. In due course, the court found the McCarran Amendment inapplicable and granted the Navy sanctuary. See United States v. Puerto Rico, 144 F. Supp. 2d 46, 53 (D.P.R. 2001).

Although our reasoning differs significantly from the district court's, we too hold that the McCarran Amendment does not waive the sovereign immunity of the United States with

-3-

respect to the administrative proceedings here at issue. The McCarran Amendment speaks of "suits," and the local proceedings, instituted by the Commonwealth's Department of Natural and Environmental Resources (DNER) under the Law of Waters, cannot be so characterized.

## I. BACKGROUND

Insofar as pertinent here, the facts are uncontroversial. During World War II, the Navy began construction of the United States Naval Station at Roosevelt Roads (NSRR). To ensure an adequate fresh-water supply, the Navy obtained a permit (the 1942 permit) from the Puerto Rico Public Service Commission to withdraw up to ten cubic feet per second from the Rio Blanco. The Navy then proceeded to construct a primary water intake in the tailrace of a privately-owned hydroelectric power plant and an emergency intake just upstream of the plant. Shortly thereafter, a federal agency acquired title to the hydroelectric plant and conveyed it to the Puerto Rico Water Resources Authority (PRWRA). In consideration of the conveyance, the PRWRA issued a permit (the 1944 permit) granting the federal government the right "to continue the use,

operation, and maintenance" of the water supply system free of charge for as long as the NSRR remained operational.[1]

Puerto Rico enacted the Law of Waters in 1976. The statute directs the Secretary of the DNER to formulate an integrated plan for conservation, development, and use of the Commonwealth's water resources, 12 P.R. Laws Ann. § 1505(a), set water consumption priorities, id. § 1505(e), and establish and administer a system that allocates water based on those priorities, id. § 1505(j). The statute contemplates the issuance of permits for the drilling of water wells and the granting of franchises for the utilization of surface waters. Id. § 1509.

The statutory regime further provides that when a body of water lacks sufficient volume to meet the demands that are made upon it, the Secretary may institute a process to allocate the available water among competing claimants. Id. § 1515. The statute grants affected parties the right to a hearing before the Secretary — a hearing that incorporates the right to counsel, the right to present evidence, and similar procedural protections. Id. § 1519. Although the statute terms such

─────────────────────

[1]The parties hotly debate whether the 1944 permit granted a right to withdraw water or merely an easement-like right to maintain the water supply system. We have no occasion to reach this issue.

-5-

hearings "quasi-judicial," no court officer is involved; the details of the process are spelled out in the DNER's regulations, and the Secretary's decision is final unless an aggrieved party seeks review within thirty days in a court of first instance. Id. § 1520.

In 1986, the DNER, acting under the Law of Waters, admonished the Navy that it needed to update its franchise for diverting water from the Rio Blanco. Thinking this a mere formality, the Navy submitted a renewal application. The Secretary never acted upon the application, claiming that it was incomplete.

The matter remained on the back burner until July 7, 1999, when the DNER served the Navy with a "cease-and-show-cause" order. This order rested on the premise that the Navy was withdrawing water from the Rio Blanco without a valid franchise (and thereby transgressing the Law of Waters). After some intermittent contacts, marked chiefly by bureaucratic wrangling, the Secretary issued a second order, dated October 29, 1999, directing the Navy to (1) initiate a franchise request for the primary and emergency water intake locations, (2) install metering devices to measure water extraction from both intakes, (3) reimburse the Commonwealth for prior water consumption, and (4) pay provisional user fees until its water

rights claims were administratively determined. This order informed the Navy, in no uncertain terms, that it was obliged to participate in franchise application proceedings, and that the DNER might ultimately grant or deny a franchise, taking into account "the needs of the entire community of the area."

Dismayed by the DNER's dismissive attitude toward its rights under the 1942 and 1944 permits, the Navy sued the Commonwealth and the Secretary. Its complaint asked the federal district court both to enjoin the defendants from enforcing the DNER's orders, and to confirm the Navy's right to withdraw water from the Rio Blanco as provided in the 1942 and 1944 permits. The Navy advanced a golconda of arguments in support of these prayers for relief, alleging, inter alia, that the 1944 permit bestowed an affirmative right to withdraw water from the Rio Blanco free of charge, and that the Secretary's efforts to plunge the Navy into administrative water use proceedings infringed the sovereign immunity of the United States. The defendants took a much dimmer view of the combined force and effect of the Navy's permits. In addition, they maintained that the ongoing DNER proceedings fell within the waiver of sovereign immunity effected by the McCarran Amendment.

On November 22, 1999, the district court enjoined all DNER proceedings against the Navy pendente lite. The defendants

-7-

then moved to dismiss the action. Pertinently, they posited that the waiver contained in the McCarran Amendment extended to administrative proceedings of the type and kind initiated by the Secretary under the Law of Waters. The Navy opposed the motion. In regard to the sovereign immunity issue, it advanced several reasons why the McCarran Amendment did not pave the way for the DNER proceeding. Among other things, the Navy asseverated that the proceeding was not a general stream-wide adjudication of the sort envisioned by the McCarran Amendment, but, rather, a purely administrative proceeding limited to a single user.

In response, the defendants reiterated their argument that the administrative proceedings were covered by the McCarran Amendment. They suggested that the particular administrative proceeding they had initiated was merely the first in a series of proceedings which, in due course, would involve other water rights claimants. To emphasize this last point, the defendants moved on January 31, 2001, for a limited modification of the stay in order to permit them to join other parties in the ongoing administrative proceeding and carry out a general stream-wide allocation referable to the Rio Blanco.

The district court denied both motions on March 30, 2001, and set the case for trial. On May 9, the court reversed its field and advised the parties that it would address the

issues raised by the defendants' motion to dismiss in advance of trial. Roughly four weeks later, the court issued an opinion that not only denied the motion to dismiss but also declared that federal sovereign immunity barred the Secretary from compelling the Navy to participate in the ongoing administrative proceeding.[2] The court based this conclusion on the fact that the Navy's water rights antedated the McCarran Amendment. See United States v. Puerto Rico, 144 F. Supp. 2d at 52-53. This appeal followed.

## II. DISCUSSION

Although a plethora of other interesting questions lurk in the penumbra of this case, we deem the sovereign immunity issue dispositive. Consequently, we start by describing the legal framework applicable to that issue, explain briefly why we reject the district court's rationale, and then proceed to the merits. Since the existence vel non of sovereign immunity here

---

[2]Because the United States, to this point, had not moved affirmatively for remedial action, the court's ruling was, in effect, a sua sponte grant of declaratory and injunctive relief. We need not probe this seeming anomaly, however, as the defendants have not made a developed argument that we should vacate the order on the ground of procedural irregularity, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting that "issues . . . unaccompanied by some effort at developed argumentation are deemed waived"), but, rather, have elected to attack the district court's ruling head-on.

depends upon a question of waiver, and that question in turn depends on statutory construction, we afford plenary review. Strickland v. Comm'r, Me. Dep't of Human Servs., 96 F.3d 542, 545 (1st Cir. 1996).

## A. The Legal Framework.

It is common ground that absent waiver or consent, federal sovereign immunity precludes a state from hauling the United States into either a state court or an adversarial state administrative proceeding. But Congress can waive federal sovereign immunity, and the McCarran Amendment — the sole "waiver" statute that is at issue here — constitutes an express waiver of that immunity in suits for the adjudication of water rights. It provides in pertinent part:

> Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as

> a private individual under like
> circumstances:  <u>Provided</u>, That no judgment
> for costs shall be entered against the
> United States in any such suit.

43 U.S.C. § 666(a).

Typically, waivers of federal sovereign immunity are strictly construed.  <u>E.g.</u>, <u>United States</u> v. <u>Horn</u>, 29 F.3d 754, 762 (1st Cir. 1994).  In <u>United States</u> v. <u>Idaho</u>, 508 U.S. 1 (1993), the Supreme Court confirmed that this interpretive approach applies in the context of the McCarran Amendment.  The Court stated:

> Any such waiver must be strictly construed
> in favor of the United States, and not
> enlarged beyond what the language of the
> statute requires.  But just as we should not
> take it upon ourselves to extend the waiver
> beyond that which Congress intended[,] . . .
> [n]either, however, should we assume the
> authority to narrow the waiver that Congress
> intended.

<u>Id.</u> at 6 (citations and internal quotation marks omitted).

The short of it is that congressional intent remains the key determinant of the scope of a waiver of federal sovereign immunity — and the McCarran Amendment is no exception to this rule.  To discern what Congress intended, we look primarily to the language and structure of the statute.  <u>See</u> <u>United States</u> v. <u>Hilario</u>, 218 F.3d 19, 23 (1st Cir. 2000). Plain meaning controls except when the statutory text is ambiguous, or when literal application of the words would either

-11-

contravene clear legislative intent or lead to an absurd result.
Id.

## B.  **The District Court's Rationale.**

The district court held the McCarran Amendment waiver inapplicable on non-retroactivity grounds.  United States v. Puerto Rico, 144 F. Supp. 2d at 52-53.  We agree with the defendants that this reasoning misses the mark.[3]

There is, of course, a general presumption against applying statutes retroactively.  See Landgraf v. U.S.I. Film Prods., 511 U.S. 244, 280 (1994).  This presumption, combined with the rule of strict construction for waivers of federal sovereign immunity, can suffice to ground a plausible argument that the McCarran Amendment was not intended to have retroactive application.  The rub, however, is that the case before us does not involve a backward-looking application of the statute.

The McCarran Amendment was adopted in 1952, and the DNER proceeding against the Navy did not commence until 1999. A law is not considered retroactive merely because events occurring prior to its passage are implicated in subsequent proceedings under it.  See Campbell v. United States, 809 F.2d 563, 571 (9th Cir. 1987); Alexander v. Robinson, 756 F.2d 1153,

---

[3]The United States, to its credit, concedes this point (although it vigorously defends the district court's decision on alternate grounds).

-12-

1155 n.5 (5th Cir. 1985). Thus, the fact that the United States traces its water rights to permits issued in the early 1940s does not alter the conclusion that the use to which the defendants seek to put the statutory waiver would be a prospective application, not a retrospective one. Because the defense of sovereign immunity exists wholly apart from any legal rights that the Navy might claim under the 1942 and 1944 permits, see United States v. Dist. Ct. ex rel. Eagle County, 401 U.S. 520, 525-26 (1971), the incidence of federal sovereign immunity cannot turn on the date a particular right was acquired. See Campbell, 809 F.2d at 571 (explaining that "the presumption against 'retroactivity' has generally been applied only when application of the new law would affect rights or obligations existing prior to the change in law"). Hence, the McCarran Amendment applies to water rights acquired prior to 1952, as long as the suit against the government is commenced subsequent to that date. See, e.g., Eagle County, 401 U.S. at 523 (finding the McCarran Amendment applicable even though the underlying federal rights were acquired in 1905).

## C. The Merits.

Despite the fact that we do not accept the district court's ratio decidendi, we nonetheless may affirm the judgment on any independent ground that is apparent in the record. See,

-13-

e.g., Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 52 (1st Cir. 2001). The Navy argues that the waiver embodied in the McCarran Amendment does not extend to purely administrative proceedings (such as the proceeding that the Secretary commenced). We turn next to that argument.[4]

In crafting the McCarran Amendment, Congress consistently used the word "suit" to describe the matters affected by the statutory waiver of federal sovereign immunity. That word appears no fewer than seven times in a relatively compact statute (most of which is reproduced above). The word "suit" has a particularized meaning in legal parlance; it refers specifically to an action in a judicial forum. See Black's Law Dictionary 1448 (7th ed. 1999) (defining a "suit" as "[a]ny proceeding by a party or parties against another in a court of law") (emphasis supplied). The term's meaning was essentially the same a half-century ago (when Congress enacted the McCarran Amendment). E.g., Stoll v. Hawkeye Cas. Co., 185 F.2d 96, 98 (8th Cir. 1950) (stating that the generally accepted definition of the word "suit" refers to a "proceeding in a court of justice") (quoting Weston v. City Council of Charleston, 27 U.S.

_____

[4]Because we find this argument compelling, we need not evaluate the Navy's asseveration that the McCarran Amendment does not apply because the DNER proceeding is neither a general stream-wide adjudication nor an "adjudication of rights" within the contemplation of the statute.

(2 Pet.) 449, 464 (1829) (emphasis supplied)). The presumption is that Congress knew, and purposefully embraced, that particularized meaning when it chose to employ the word in the text of the McCarran Amendment. See Morissette v. United States, 342 U.S. 246, 263 (1952); United States v. Nason, 269 F.3d 10, 16 (1st Cir. 2001).

Nothing in the language or structure of the McCarran Amendment rebuts this presumption.[5] To the contrary, Congress's persistent use of terms such as "defendant," "necessary party," and "the court having jurisdiction," virtually compels the conclusion that the repeated references to suits were fully calculated. It follows that the waiver was meant to apply only to judicial proceedings.

The defendants attempt to blunt the force of Congress's seven-fold resort to the word "suit" in the text of the McCarran Amendment by reliance on the Ninth Circuit's opinion in United States v. Oregon, 44 F.3d 758 (9th Cir. 1994). They cite this case for the proposition that "suit," as that word is used in the McCarran Amendment, encompasses administrative as well as judicial proceedings. Whether or not Oregon is correctly

_____

[5]To be sure, the McCarran Amendment does contain a reference to the "administration of [water use] rights," but read in context, these words grammatically refer to suits for the administration of such rights, and so fail to broaden the scope of the waiver.

decided — a matter on which we take no view — we do not believe that the opinion supports so sweeping a proposition.

In <u>Oregon</u>, the Ninth Circuit held that a unitary water rights adjudication framework, which contained both administrative and judicial components, satisfied the McCarran Amendment's definition of a suit. <u>Id.</u> at 767. The court noted that the primary purpose of the McCarran Amendment was to permit comprehensive water rights adjudications in the arid southwestern states (where, historically, the United States held a major portion of such rights). <u>See</u> <u>id.</u> at 765. Most of those states adopted specific statutory schemes for water rights adjudications, and those schemes tended to delegate significant authority to administrative agencies. <u>See</u> <u>id.</u> at 763-65. The court reasoned that to exclude such proceedings from the scope of the waiver granted by the McCarran Amendment would defeat the drafters' intent to facilitate water use adjudications in those regions. <u>See</u> <u>id.</u> at 765-67; <u>see</u> <u>also</u> <u>Colo. River Water Conserv. Dist.</u> v. <u>United States</u>, 424 U.S. 800, 819 (1976) ("The consent to jurisdiction given by the McCarran Amendment bespeaks a policy that recognizes the availability of comprehensive state systems for adjudication of water rights as the means for achieving these goals.").

The statutory scheme considered in <u>Oregon</u> was a unitary scheme that contained two interconnecting tracks. Although it envisioned that an action would be commenced administratively by the agency (the Oregon Water Resources Department), that action automatically would proceed to a judicial forum upon completion of the administrative process. <u>See</u> <u>Oregon</u>, 44 F.3d at 764. In other words, the Oregon statute constructs a seamless proceeding, possessing both administrative and judicial components. These two components "are not independent or unrelated, but parts of a single statutory proceeding, the earlier stages of which are before the [agency] and the later stages before the court." <u>Pacific Live Stock Co.</u> v. <u>Or. Water Bd.</u>, 241 U.S. 440, 451 (1915) (commenting upon Oregon's statutory scheme for the administration of water rights). In other words, the agency "merely paves the way for an adjudication by the court of all the rights involved." <u>Id.</u> Thus, even though the word "suit" contemplates an action in a judicial forum, it is at least arguable that this seamless proceeding constitutes a suit.

Puerto Rico's approach differs in material respects from Oregon's. The Law of Waters does not establish a seamless process with both administrative and judicial components. Rather, it contemplates a purely administrative proceeding — a

proceeding that ordinarily will terminate with a final order of the Secretary. It defies common sense to say that this type of administrative proceeding, wholly lacking any integrated judicial involvement, is a fair congener to a proceeding under the Oregon scheme (and, thus, constitutes a suit).

To plug this hole, the defendants respond that a proceeding under the Law of Waters leaves open the possibility of judicial review. See 12 P.R. Laws Ann. § 1520 (conferring upon any aggrieved party a right to seek judicial review of the DNER's final order within thirty days). Their premise is true, but their suggested conclusion — that this right of judicial review transmogrifies the underlying proceeding into a suit — does not hold water. We explain briefly.

Section 1520 is a bareboned provision, which lacks any semblance of detail. Therefore, we must assume that it merely acknowledges the right of judicial review embodied in Puerto Rico's Uniform Administrative Procedure Act (UAPA), 3 P.R. Laws Ann. §§ 2101-2201.[6] Cf. Becker v. FEC, 230 F.3d 381, 384 (1st Cir. 2000) (reasoning that because a federal statute contained no provisions governing the mode and manner of judicial review,

---

[6]Under the UAPA, "[a]ny party which is adversely affected by a final order or resolution of an agency" has thirty days within which to file a petition for review in a local court. 3 P.R. Laws Ann. § 2172.

the provisions set forth in the APA applied). That review is highly circumscribed and cannot serve to compensate for the absence of meaningful judicial involvement in the underlying proceeding. After all, virtually every final agency action is reviewable by a court of law. See, e.g., Administrative Procedure Act (APA) § 704, 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). To accept that the right to a limited APA-type of judicial review suffices to convert a purely administrative proceeding into a suit would compel the absurd conclusion that all administrative proceedings are suits and that no purely administrative proceedings exist. We cannot endorse so radical a proposition.

A further comparison between Oregon's seamless scheme for the adjudication of water rights and Puerto Rico's Law of Waters illustrates the point. Under the former scheme, a reviewing court is not constrained by the administrative record but may receive additional evidence, Warner Valley Stock Co. v. Lynch, 336 P.2d 884, 901 (Or. 1959), or, alternatively, may appoint a special master to take further testimony, Or. Rev. Stat. § 539.150. Relatedly, such a scheme allows de novo

judicial review of factual matters.  See Warner Valley, 336 P.2d at 900.

The UAPA (and, thus, Puerto Rico's Law of Waters) operates quite differently.  Under it, an inquiring court is limited to the administrative record, and the agency's factfinding "shall be upheld by the court [so long as] grounded on substantial evidence filed in the administrative record."  3 P.R. Laws Ann. § 2175.  Thus, a court examining a decision of the Secretary in a case under the Law of Waters would be forced to rely solely on evidence presented in the administrative proceeding, and would have to defer broadly to the Secretary's findings of fact.  Limitations such as these underscore that Puerto Rico's water rights proceedings are both procedurally and substantively different from a traditional suit.  In effect, an agency functions under the UAPA scheme as an independent adjudicator within the executive branch of government, whereas, under a seamless scheme possessing both administrative and judicial components, an agency functions as an aid to the court.

In sum, a seamless administrative-judicial scheme (such as Oregon's) places the court in the role of independent adjudicator, not merely in the role of reviewer of a pre-compiled record.  Based on this salient distinction, we hold that even if Oregon's scheme might be termed a suit, Puerto

Rico's counterpart scheme cannot be so characterized. Put another way, because a DNER proceeding under the Law of Waters contains no significant judicial component, it is not equivalent to a suit — and the balm of the McCarran Amendment does not extend to it.

We need go no further. There is simply no persuasive evidence that the repeated use of the word "suit" by the drafters of the McCarran Amendment was either a linguistic accident or an awkward attempt to convey a meaning different than the norm.[7] Thus, we are bound to accord the word "suit" its ordinary meaning. See Morissette, 342 U.S. at 263; Nason, 268 F.3d at 16. So defined, the word presupposes a meaningful adjudication in a judicial forum. Since the Law of Waters does not provide for such an adjudication, the McCarran Amendment does not apply here. It follows inexorably that federal sovereign immunity bars the proceeding that the Secretary seeks to launch against the Navy.

---

[7]For what it may be worth, we note that nothing in the legislative history of the McCarran Amendment establishes that Congress intended the waiver of federal sovereign immunity to cover a purely administrative scheme for the adjudication of water rights. In the Senate hearings, the distinction between administrative and judicial actions was drawn at several points, see, e.g., Hearings on S.18, Subcomm. Sen. Jud'y Comm., 82d Cong., 1st Sess., 10-11, 23, 53 (1952), but the hearings are unilluminating as to the key issue of whether the Amendment was ultimately intended to encompass purely administrative proceedings.

## III. CONCLUSION

To recapitulate, we hold that the McCarran Amendment does not waive federal sovereign immunity with respect to the purely administrative proceeding commenced against the Navy under the Law of Waters. The upshot is that the federal government's immunity remains intact and the Secretary lacks the authority to compel the Navy either to participate in the ongoing administrative proceeding or to enforce the October 29, 1999 order.[8]

**Affirmed and remanded**.

---

[8]Because our reasoning differs from that of the lower court, we remand the case for the entry of an amended decree consistent with this opinion.